IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-1988-JLK

ROCKY MOUNTAIN WILD,
GRAND CANYON TRUST,
CENTER FOR BIOLOGICAL DIVERSITY,
SIERRA CLUB,
SOUTHERN UTAH WILDERNESS ALLIANCE,
BIODIVERSITY CONSERVATION ALLIANCE, and
LIVING RIVERS,

      Petitioners,

v.

NEIL KORNZE, Director, Bureau of Land Management, and
U.S. BUREAU OF LAND MANAGEMENT,

      Respondents,

AMERICAN PETROLEUM INSTITUTE,

      Respondents-Intervenor.

---

**PETITIONERS' OPENING BRIEF
IN SUPPORT OF THEIR PETITION FOR REVIEW**

---

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................iii

CERTIFICATE OF COMPLIANCE.................................................................iv

INTRODUCTION.................................................................................................1

BACKGROUND...................................................................................................2

I.      THE ENDANGERED SPECIES ACT AND DUTY TO CONSULT.........2

II.     FACTUAL BACKGROUND................................................................4

      A.     The Colorado Plateau's Endangered Species And Habitats.........4
            1.    The Four Endangered Fish...........................................4
            2.    Threatened and Endangered Plants.............................5
            3.    Threatened and Endangered Birds and Mammals.........6

      B.     Oil Shale And Tar Sands Deposits on the Colorado Plateau.........6

      C.     BLM's Resource Management Plans for Oil Shale and Tar Sands.........8
            1.    Federal Land Policy and Management Act And
                  Applicable Regulations.................................................8
            2.    The 2005 Energy Policy Act And 2008 RMP Amendments.........9
            3.    The 2013 RMP Amendments.......................................10

ARGUMENT.......................................................................................................13

I.      PETITIONERS HAVE STANDING..................................................13

II.     STANDARD OF REVIEW.................................................................14

III.    THE BLM VIOLATED THE ESA BY NOT CONSULTING ON THE RMP
        AMENDMENTS...............................................................................15

      A.     BLM RMP Amendments Are Agency Actions.........................15

      B.     The RMP Amendments May Affect Listed Species And Critical Habitat.........18
            1.    The "May Affect" Threshold Is Low.............................18
             2.    Because The RMP Amendments Are A Precondition To
                  Leasing And Developing Land Containing Oil Shale And
                  Tar Sands, They May Affect Listed Species.................20
            3.    Adverse Effects To Four Endangered Fish...................23
             4.    Adverse Effects To Listed Plants And Birds.................26
             5.    BLM's "No Effect" Determination Violates The ESA And APA.........28

i

a.    BLM's Rationalizations For Its "No Effect" Determination – Uncertainty and Deferred Consultations – Contravene The ESA ...................................29

b.    BLM's Uncertainty Claim Is Contrary To Best Available Science, Is Unsupported By The Record, And Reflects The Agency's Disregard Of Relevant Information ...............32

CONCLUSION AND REQUESTED REMEDY ....................................................36

CERTIFICATE OF SERVICE ....................................................................38

# TABLE OF AUTHORITIES

## CASES:

Allen v. Wright,
  468 U.S. 737 (1984) .................................................................................13

Alliance for Wild Rockies v. Kruger,
  2014 WL 1614426 (D. Mont. April 23, 2014) ........................................20

Alliance for Wild Rockies v. U.S. Dept. of Agric.,
  772 F.3d 592 (9th Cir. 2014) ...................................................................16

Baltimore Gas & Elec. v. Natural Resources Defense Council,
  462 U.S. 87 (1983) ...................................................................................15

Colo. Envtl Coalition v. Dept. of Defense,
  819 F.Supp.2d 1193 (D. Colo. 2011) ............................................19,22,30

Committee to Save the Rio Hondo v. Lucero,
  102 F.3d 445 (10th Cir. 1996) .................................................................13

Conner v. Burford,
  848 F.2d 1441 (9th Cir. 1988) ............................................................29,30

Davis v. Mineta,
  302 F.3d 1104 (10th Cir. 2002) ...............................................................14

Forest Guardians v. Forsgren,
  478 F.3d 1149 (10th Cir. 2007) ...............................................................16

Friends of the Bow v. Thompson,
  124 F.3d 1210 (10th Cir. 1997) ..........................................................15,33

Friends of the Earth v. Laidlaw Environmental Services,
  528 U.S. 167 (2000) .................................................................................13

Gifford-Pinchot Task Force v. U.S. Fish & Wildlife Serv.,
  378 F.3d 1059 (9th Cir. 2004) .................................................................16

Karuk Tribe of Cal. v. U.S. Forest Serv.,
  681 F.3d 1006 (9th Cir. 2012) .........................................................16,18,19

Lane County Audubon Soc'y v. Jamison,
  958 F.2d 290 (9th Cir. 1992) ...................................................................16

Lockyer v. U.S. Dep't of Agric.,
  575 F.3d 999 (9th Cir. 2009) ...................................................................18

Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto.,
  463 U.S. 29 (1983) ..............................................................................15,32

Nat'l Wildlife Fed'n v. Brownlee,
  402 F.Supp.2d 1 (D.D.C. 2005) ...............................................................30

NRDC v. Houston,
  146 F.3d 1118 (9th Cir. 1998) .................................................................15

NRDC v. Jewell,
  749 F.3d 776 (9th Cir. 2014) ...................................................................16

New Mexico v. BLM,
  565 F.3d 683 (10th Cir. 2009) ..........................................................9,13,31

Norton v. S. Utah Wilderness Alliance,
  542 U.S. 55 (2004) ...................................................................................17

Olenhouse v. Commodity Credit,
  42 F.3d 1560 (10th Cir. 1994)................................................................15,36
Pacific Rivers Council v. Shepard,
  2012 WL 950032 (D. Or. Mar. 20, 2012) ...............................................21
Pennaco Energy v. U.S. Department of Interior,
  377 F.3d 1147 (10th Cir. 2004).............................................................9,21
Rio Grande Silvery Minnow v. Bureau of Reclamation,
  601 F.3d 1096 (10th Cir. 2010)...............................................................13
Salix v. U.S. Forest Serv.,
  944 F.Supp.2d 984 (D. Mont. 2013) .......................................................31
San Juan Citizens Alliance v. Salazar,
  2009 WL 824410 (D. Colo. March 30, 2009) .........................................17
S. Utah Wilderness Alliance v. OSM,
  620 F.3d 1227 (10th Cir. 2010)...............................................................14
Swan View Coalition v Weber,
  –F.Supp.3d–, 2014 WL 4824551 (D. Mont. Sept. 25, 2014) ..................19
Trout Unlimited v. Lohn,
  645 F.Supp.2d 929 (D. Or. 2007) ...........................................................29
TVA v. Hill,
  437 U.S. 153 (1978)..................................................................................2
Utah Shared Access Alliance v. Carpenter,
  463 F.3d 1125 (10th Cir. 2006)...............................................................21
W. Watersheds Project v. Kraayenbrink,
  632 F.3d 472 (9th Cir. 2011)...............................................19,20,26,31
W. Watersheds Project v. Matejko,
  468 F.3d 1099 (9th Cir. 2006).................................................................16
Wilderness Soc'y v. Kane County,
  581 F.3d 1198 (10th Cir. 2008)...............................................................13
Wilderness Society v. Wisely,
  524 F.Supp.2d 1285 (D. Colo. 2007) ..................................................19,32
Wild Fish Conservancy v. Salazar,
  628 F.3d 513 (9th Cir. 2010) ...................................................................29

## STATUTES:

5 U.S.C. § 706(2) ..................................................................................................15,32

16 U.S.C. § 1531(b) ........................................................................................2
16 U.S.C. § 1532(5)(A) ...................................................................................2
16 U.S.C. § 1533(a)(3) ....................................................................................2
16 U.S.C. § 1533(b) ........................................................................................2
16 U.S.C. § 1533(c)(2) ....................................................................................2
16 U.S.C. § 1536(a)(2) .............................................................................passim
16 U.S.C. § 1536(b)(3)(A) ..............................................................................3
16 U.S.C. § 1536(b)(4)(A) ..............................................................................3
16 U.S.C. § 1536(d) ........................................................................................4
16 U.S.C. § 1540(g) ........................................................................................4

42 U.S.C. § 15927(b) ......................................................................................9
42 U.S.C. § 15927(c) ...................................................................................9,30

43 U.S.C. § 1712(a) ....................................................................................8,24
43 U.S.C. § 1712(c) ........................................................................................8
43 U.S.C. § 1732(a) ....................................................................................9,20

## REGULATIONS:

43 C.F.R. § 1601.0-2 ...............................................................................8,16,20
43 C.F.R. § 1601.0-5(b) ..................................................................................9
43 C.F.R. § 1601.0-5(c) ..................................................................................9
43 C.F.R. § 1601.0-5(n)(2) .........................................................................8,17
43 C.F.R. § 1610.5–3 ..................................................................................9,21
43 C.F.R. § 1610.5-5 ...................................................................................10,17

50 C.F.R. § 402.02 ...................................................................................passim
50 C.F.R. § 402.12(d)(1) ...............................................................................20
50 C.F.R. § 402.13 ..........................................................................................3
50 C.F.R. § 402.14(a) ......................................................................................3
50 C.F.R. § 402.14(b) ......................................................................................3
50 C.F.R. § 402.14(d) ....................................................................................29
50 C.F.R. § 402.14(g)(7) ..................................................................................3
50 C.F.R. § 402.14(h)(2) ..................................................................................3
50 C.F.R. § 402.14(i)(1) ...................................................................................3
50 C.F.R. § 402.16 ........................................................................................14

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

In accordance with the Scheduling Order, Petitioners' Opening Brief complies with the

14,000-word limit.


*/s/ Neil Levine*
Neil Levine

## INTRODUCTION

Oil shale and tar sands deposits underlie public lands in Colorado, Utah and Wyoming that are managed by the U.S. Bureau of Land Management (BLM).  These same public lands provide essential habitat for species of fish, wildlife and plants protected by the Endangered Species Act (ESA).  Extracting these deposits from BLM lands and converting them to transportation fuel comes with significant environmental consequences, especially to the continued survival and recovery of the ESA-listed species that depend on the water and land of the Colorado Plateau.

BLM manages public land resources through Resource Management Plans (RMPs), which are required under the Federal Land Policy and Management Act (FLPMA).  Pursuant to FLPMA and as the necessary first step for oil shale and tar sands development, in 2013, BLM amended six RMPs – the Vernal, Price, White River, Kemmerer, Rawlins and Green River RMPs.  These "RMP Amendments" made certain lands available for mining oil shale and tar sands, determined which lands could not be developed, and conditioned development in a manner to protect certain resource values.

However, BLM did not comply with the ESA before issuing the RMP Amendments.  Specifically, BLM failed to "consult" with the United States Fish and Wildlife Service (FWS) in accordance with ESA section 7(a)(2), a process designed to ensure that oil shale and tar sands activities do not "jeopardize" listed species or "adversely modify" their designated "critical habitat."  Consultation is required because BLM's approval of each RMP Amendment is an "agency action" that "may affect" listed species.  BLM's own analysis and projections show that oil shale and tar sands activities require water depletions from the Colorado River Basin and FWS has determined that *any* depletions "jeopardize" the continued existence of the endangered humpback chub, Colorado pikeminnow, razorback sucker, and bonytail (the "Four Endangered Fish").  The RMP Amendments thus easily trip the "may affect" trigger for ESA consultations.

Yet, BLM refused to consult at all, claiming these RMP Amendments would have "no effect" on listed species.  This finding ignores both the relevant legal standard – the ESA's low

"may affect" threshold – and the facts here, where the "best scientific and commercial information available" demonstrate the potential for damaging effects.  Moreover, BLM's attempt to justify its "no effect" determination based on possible consultations at a later project-specific stage contravenes the law.  The ESA requires BLM to consult now, at the RMP Amendment stage, to avoid the piecemeal destruction of species and their habitats by individual projects.  Further, BLM's "no effect" conclusion was arbitrary and capricious because BLM failed to consider relevant factors and documents, including those demonstrating that any water depletions within the Colorado River Basin jeopardize the Four Endangered Fish.

Accordingly, the Court should grant this Petition for Review, find that BLM violated the ESA and the Administrative Procedure Act (APA), order BLM to consult with FWS and prohibit BLM leasing and development approvals until consultation is completed on the six RMP Amendments.

## BACKGROUND

I.    THE ENDANGERED SPECIES ACT AND DUTY TO CONSULT

The ESA is a safety net for species at risk of extinction.  It provides "a program for the conservation [of] endangered species and threatened species" and "a means whereby the ecosystems upon which [such] species depend may be conserved." 16 U.S.C. § 1531(b).  "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." TVA v. Hill, 437 U.S. 153, 184 (1978).  To implement the ESA, FWS lists species that are "endangered" or "threatened" solely on the basis of biological criteria and the best available scientific and commercial data. 16 U.S.C. §§ 1533(b), 1533(c).  FWS must also designate "critical habitat" of listed species. Id. § 1533(a)(3).  Critical habitat includes both occupied and unoccupied areas that contain habitat features that are "essential to the conservation of the species[.]" Id. § 1532(5)(A).

The ESA provides several regulatory protections for listed species and their critical habitat.  Relevant here, Section 7(a)(2) prohibits federal agencies from undertaking actions that (1) are "likely to jeopardize the continued existence" of any listed species or (2) "result in the

destruction or adverse modification of" critical habitat. 16 U.S.C. § 1536(a)(2). "Jeopardy" results when it is reasonable to expect that the action would "reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Adverse modification" is defined as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for … the survival [or] recovery of a listed species." Id.

To ensure compliance with these prohibitions, the ESA includes a "consultation" process with FWS. This process must occur when a federal agency, like BLM, proposes an "agency action" that "may affect" a listed species or its designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a); Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1105 (10th Cir. 2010). During the ESA consultation process, both FWS and BLM must use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2). The type of consultation will vary depending on the degree of anticipated effects. Informal consultation is sufficient if FWS concurs in writing that the proposed action "may affect," but "is not likely to adversely affect" the species or its critical habitat. 50 C.F.R. §§ 402.13, 402.14(b). "Formal" consultation occurs when the proposed action is "likely to adversely affect" a species or its critical habitat. Id. Formal consultation is completed when FWS issues a "biological opinion" that determines whether the agency's action will jeopardize the species or adversely modify its critical habitat. 16 U.S.C. § 1536(b)(3)(A). FWS must also issue an "incidental take statement" to the federal action agency if FWS concludes that the action will neither jeopardize the species nor destroy or adversely modify critical habitat, but "may" incidentally "take" a listed species. 16 U.S.C. § 1536(b)(4)(A); 50 C.F.R. §§ 402.14(g)(7); 402.14(i)(1).

The ESA requires a broad scope of analysis during consultation. Both BLM and FWS must analyze the (1) action area, (2) the environmental baseline, and (3) the effects of the action. See 50 C.F.R. §§ 402.02; 402.14(h)(2). The "action area" includes "all areas to be affected directly or indirectly by the Federal action, and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. The "environmental baseline includes the past and present impacts

of all Federal, State, or private actions and other human activities in the action area." Id.  The

"effects of the action" include the direct, indirect, and cumulative effects to a species from the

proposed agency action. Id.[1]

During a Section 7(a)(2) consultation, the action agency is prohibited from making any

irreversible or irretrievable commitment of resources with respect to the proposed action that

may foreclose the formulation or implementation of any reasonable and prudent alternatives. 16

U.S.C. § 1536(d).  If, after consultation is completed, new information about the extent of the

activity or effects of the activity arises, the agencies are required to reinitiate the consultation

process. 50 C.F.R. § 402.16.

II.      FACTUAL BACKGROUND

     A.      The Colorado Plateau's Endangered Species And Habitats

          1.      The Four Endangered Fish

The RMP Amendments impact four species of endangered fish that are endemic to the

Colorado River Basin: bonytail, Colorado pikeminnow, humpback chub, and razorback sucker.

AR #5 at 686-698.  "Currently, no self-sustaining populations of bonytail are known to exist in

the wild, and very few have been caught anywhere." Id. at 686.  Populations of Colorado

pikeminnow are "severely reduced in all but the Green River." Id. at 690.  The humpback chub

currently occurs primarily in "relatively inaccessible canyon areas." Id. at 692.  And the

razorback sucker is "one of the most imperiled fishes in the Colorado River Basin and exists

naturally as only a few disjunct populations or scattered individuals." Id. at 698.  "Critical

habitat" has been designated for the Four Endangered Fish within the area of the RMP

Amendments. Id. at 686-698.

"Water depletions from the Colorado River Basin are a major factor in the decline of the"

Four Endangered Fish. ER #9 at 306.  FWS has determined that "*any depletion* will jeopardize

their continued existence and will likely contribute to the destruction or adverse modification of

---

[1]     Direct impacts are caused by the action and occur at the same time and place. 50 C.F.R. §
402.02 (found in definition of "effects of the action").  Indirect impacts are those that are caused
by the proposed action, but are later in time and reasonably certain to occur. Id.

their critical habitat." Id. (emphasis added); see AR #6 at 987 ("The Upper Colorado River Endangered Fisheries Recovery Implementation Program considers any water depletions from the upper Colorado River Basin, which includes the watersheds of the Green River and the White River, an adverse effect on endangered Colorado River fishes that requires consultation and mitigation."); AR #6 at 1159.  BLM has acknowledged that water depletions for individual oil shale and tar sands projects "could be quite large and represent a significant adverse impact on these riverine fish." Id. at 987 (oil shale); id. at 1157 (tar sands).

2.      Threatened and Endangered Plants

Several endangered plants are found almost exclusively on BLM lands affected by the RMP Amendments.  Dudley Bluffs bladderpod are limited to five populations on about 50 acres over a range of ten miles, on BLM-administered lands in Rio Blanco County, Colorado. AR #5 at 691 ("All known occupied habitat is located on lands with oil shale reserves.").  For the Dudley Bluffs twinpod, five populations remain on 250 acres near the junction of Piceance Creek and Ryan Gulch. Id. at 692 ("The habitat for this species is on the surface of oil shale deposits that are suitable for either underground mining or surface mining of oil shale.").  The primary threat to both species is oil shale development, which FWS declared is imminent and presents a severe threat. ER #13 at 648-50.

The clay reed-mustard has been reduced to only three populations, totaling about 6,000 individual plants. AR #5 at 689.  All remaining populations occur on lands administered by the BLM, in Uintah County, Utah, and "its entire habitat is underlain by oil shale." Id.  Shrubby reed-mustard is also endemic to Utah's Uinta Basin, with its entire range "underlain by oil shale and conventional oil and gas deposits." Id. at 699.  The Parachute beardtongue is known to exist at six locations in Garfield County, Colorado, within the Piceance Basin, totaling about 200 acres. Id. at 697.  Only four populations are considered viable, with three of these on land owned by an energy company, and the other on BLM land. Id.  The plant "grows on steep, oil shale outcrop slopes of white shale talus," and oil shale development is considered a potential threat to the species. Id.

The Pariette cactus is down to one population in Duchesne County, Utah, located entirely on BLM lands leased for oil and gas development. AR #5 at 697-98.  The Uinta Basin hookless cactus occurs in Carbon, Duchesne, and Uintah Counties in Utah, where potential threats include "oil shale and tar sands mining." Id. at 700-01.  The Wright fishhook cactus occurs in Emery, Sevier, and Wayne Counties, Utah, within the vicinity of the San Rafael and Tar Sand Triangle Special Tar Sands Areas. Id. at 706.  And Ute's ladies-tresses, which is known to occur in Duchesne, Garfield, Uintah, and Wayne Counties, Utah (id. at 702-03), "is dependent on a high water table," and "could be adversely affected by *any* water depletions . . . associated with oil shale development in Utah." AR #6 at 987 (emphasis added).

### 3.   Threatened and Endangered Birds and Mammals

In addition to endangered fish and plants, two listed species of birds are found within the affected analysis area. AR #5 at 680.  The Mexican spotted owl "is a rare permanent resident in the southern and eastern parts of Utah on the Colorado Plateau," and may occur in the vicinity of the Raven Ridge, Tar Sand Triangle, and White Canyon Special Tar Sands Areas. Id. at 695-96.  And the southwestern willow flycatcher is known to occur in portions of the Uinta Basin and in the vicinity of the P.R. Spring, San Rafael, Tar Sand Triangle, and White Canyon Special Tar Sands Areas. Id. at 700.

### B.   Oil Shale And Tar Sands Deposits on the Colorado Plateau

The Colorado Plateau contains deposits of oil shale and tar sands. ECF Doc. 38 at 2.  The Green River formation holds oil shale over approximately 8.6 million acres in Colorado, Utah and Wyoming, over 70% of which occur on federal lands. AR 1 at 17; ECF 28, ¶ 29 (Answer). Tar sand deposits are restricted to southeastern Utah, within 11 designated "special tar sands areas" (STSAs), two-thirds of which are on BLM lands. 45 Fed. Reg. 76,800 (Nov. 20 1980); 46 Fed. Reg. 6077 (Jan. 21, 1981).  Hydrocarbons found within these deposits can be converted to transportation fuels. AR #5 at 377, 420.

These fuels, however, are not easily extracted.  They have not remained in the ground long enough to liquefy and thus must be superheated to release the liquid hydrocarbons that can

be processed. AR #5 at 377 ("The kerogen must be heated to from 600ºF to 750ºF to convert it into oil because it was never buried deeply enough for nature to convert the kerogen to oil."). For this reason, commercial attempts to recover and develop oil shale and tar sands deposits in the United States over the last century have failed. ECF Doc. 38 at 2; AR #8 at 1931-32; AR #6 at 1096.[2]

Oil shale is a sedimentary rock that contains kerogen – an organic material that is a precursor to oil. AR #5 at 377.  There are three major steps to develop these oil shale deposits: extracting the oil shale, separating the kerogen, and upgrading the kerogen to a transportable crude oil. AR #5 at 380-82.  The first two steps depend on the extraction method available and separation process chosen.  Strip mining the land surface occurs where the oil shale is within 500 feet of the surface, whereas underground mining occurs when the shale is deeper than 500 feet. AR #5 at 384; AR #4199 at 513345 (explaining processes used at two Colorado project sites in 2012).[3]  Once the shale rock is extracted, the kerogen is then separated by a technique known as "retorting." AR #5 at 382-83.  Alternatively, an operator may choose an *in-situ* separation process that requires heating in the ground before bringing the liquefied kerogen to the surface. Id.  Once separated, the oil is extremely viscous and requires additional processing known as "upgrading." AR #5 at 383.  Whether the shale is first mined or *in situ* processing occurs, separating and liquefying the kerogen from the shale requires extreme heat and significant amounts of water. Id.; AR #6 at 895-99; AR #487 at 136747-48; AR #4 at 256.

"Tar sands are sedimentary rocks containing bitumen, a heavy hydrocarbon compound." AR #5 at 420.  Like oil shale, tar sands can be developed through a three-step process, including

---

[2]     These oil shale and tar sands deposits are often mistaken for similarly named, but quite different, resources found elsewhere in North America.  As BLM noted, "[o]il shale should not be confused with shale oil. In shale oil, the strata were buried deeply enough that the temperature was sufficiently high to naturally convert the kerogen into oil." AR #5 at 377.  Likewise, Utah's tar sands are significantly different that the tar sands found in northern Alberta, Canada. AR #8 at 2099-2100; AR #6 at 1097 n.1, 1130.

[3]     This is because "500 ft is assumed to be the maximum amount of overburden where surface mining can occur economically, using today's technologies." AR #5 at 384. Overburden is defined as "[t]he depth of the formation, as measured from the surface to the top of the resource." AR #3505 at 517763.

*in situ* processing or mining plus surface retorts. Id. at 422-23.  Strip mining occurs when tar sands deposits are within 150 feet of the surface. Id. at 423.[4]  Once mined, bitumen is separated from sand and clay either through retorting or the use of a chemical solvent. Id.  Tar sands located below 500 feet require *in situ* processing. Id.  *In situ* processing requires the application of a significant amount of heat (via steam or combustion) to separate the bitumen. Id.; AR #6 at 1097-98.  Because the bitumen remains extremely viscous after separation, it requires additional heating and upgrading before being shipped and refined. AR #5 at 423.  All of these processes require water. AR #6 at 1119-25.

Notwithstanding the difficulties associated with developing these immature fuels, BLM touts the potential of these resources.  In 2008, BLM claimed that oil shale in the Green River Formation contains between 1.5 and 1.8 trillion barrels of oil. 73 Fed. Reg. 69,414 (Nov. 18, 2008).  In 2012, BLM stated that for oil shale, surface mining operations would produce 25,000 to 30,000 barrels-per-day, and *in situ* facilities would produce 30,000 to 50,000 barrels-per-day. AR #6 at 863, 871.  These numbers are lower than 2008 projections, in part because there is not enough water available to achieve the production levels BLM Projected in 2008. Id. at 863, n.1.  BLM projects from 20,000-bbl/day "up to approximately 300,000 bbl/day" for tar sands. AR #6 at 1097, 1105.

      C.      BLM's Resource Management Plans for Oil Shale and Tar Sands

            1.      Federal Land Policy and Management Act And Applicable Regulations

BLM lands are divided into management units known as districts or resource areas.  For each unit, FLPMA requires BLM to develop an RMP. 43 U.S.C. § 1712(a).  An RMP is a kind of "zoning" document in which BLM establishes what land uses are permitted and where and how they may occur. Id. § 1712(c); 43 C.F.R. § 1601.0-5(n).  By establishing allowable uses and conditions of use, RMPs "are designed to guide and control future management actions." 43 C.F.R. § 1601.0-2; AR #5104 at 324390 (BLM Handbook stating RMPs "are the basis for every

---

[4]      BLM found that underground mining of tar sands does not occur because it is not a viable technology. AR #5 at 423, n.20.

on-the-ground action the BLM undertakes"). Under FLPMA, BLM's project-specific decisions must comply with an RMP. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a) ("All future resource management authorizations and actions . . . shall conform to the approved plan.").[5]

BLM authorizes the development of mineral resources through a three-stage decisionmaking process. AR #5 at 328; see New Mexico v. BLM, 565 F.3d 683, 689, n.1 (10th Cir. 2009); Pennaco v. Dept. of Interior, 377 F.3d 1147, 1151-52 (10th Cir. 2004). The first involves establishing permissible uses of public lands in an RMP and is the stage at issue in this case. AR #5 at 328. Second, BLM leases certain parcels that had been made available for the particular mineral use. Id. Third, BLM approves a development plan on the leased parcel. Id. As BLM explained, the RMP Amendments:

> [m]ake[] decisions about which lands are allocated as open or closed to oil shale/tar sands development. Lands allocated as open are those within which the Secretary may initiate a call for nominations, to which project proponents may respond by submitting applications to lease lands where they propose to develop specific projects.

AR #5 at 337.

## 2.   The 2005 Energy Policy Act And 2008 RMP Amendments

In 2005, Congress passed the Energy Policy Act (EPAct). AR #36. Despite past failures to develop these resources (ECF Doc. 38 at 2), Congress identified oil shale and tar sands deposits in Colorado, Utah, and Wyoming as important sources of domestic transportation fuels. 42 U.S.C. § 15927(b). The EPAct thus directs the Secretary of the Interior, through BLM, to establish a "program" for oil shale and tar sands on public lands. Id. § 15927(c). BLM is required to "make available" areas BLM "considers to be necessary to conduct research and development activities with respect to technologies for the recovery of liquid fuels from oil shale and tar sands resources on public lands." Id. Leasing and development must be conducted in "an environmentally sound manner, using practices that minimize impacts." Id. § 15927(b).

---

[5]      Conformity is defined as: "a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment." 43 C.F.R. § 1601.0-5(b). "Consistent" is then defined as requiring that management actions "will adhere to the terms, conditions, and decisions of officially approved and adopted resource related plans." Id. § 1601.0-5(c).

BLM recognized that before it could establish a program, it would have to first amend the RMPs within Colorado, Utah and Wyoming to designate certain areas as available for oil shale and tar sands development.[6]  BLM found that amending the RMPs was a "major federal action" that "may" result in significant impacts to the environment under the National Environmental Policy Act (NEPA) and thus prepared an environmental impact statement (EIS). 42 U.S.C. § 4332(C); see AR #27.  On November 17, 2008, BLM finalized a programmatic EIS and issued a Record of Decision applicable to ten RMPs that designated over 2 million acres as available for oil shale leasing and development in Colorado, Utah and Wyoming and approximately 430,000 acres for tar sands leasing in Utah. AR #25 at 6342-43.

3.    The 2013 RMP Amendments

In 2011, BLM agreed to revisit the 2008 RMP Amendments. AR #21 at 6282 (public notice indicating BLM taking "fresh look … in order to consider which lands should be open to future leasing of oil shale and tar sands resources").  BLM's new process sought to "identify areas that may be excluded from any future oil shale and tar sands resources leasing." Id.

BLM finalized the new RMP Amendments on March 22, 2013. AR #1.  In the RMP Amendments, BLM designated approximately 678,000 acres as open for oil shale in Colorado, Utah and Wyoming. AR #1 at 12, 108-111.  BLM also designated 132,220 acres in Utah for tar sands leasing and development. Id. at 12.  With the designations in place, all of these public lands can be leased and developed for oil shale and tar sands. AR #5 at 394 ("new [research, development and demonstration] leases could be issued in any areas opened to commercial oil shale leasing"); id. at 424 (same for "tar sands leasing").

BLM's RMP Amendments also identified lands that are closed to leasing and development. AR #5 at 328; see AR #1 at 76 ("The allocation decision, by specifying which lands are open to application to lease, only permits the BLM to consider such applications to

---

[6]    An RMP amendment is a "modification of one or more parts of an existing RMP." AR #5104 at 324405; id. at 324433 ("Land use plan decisions are changed through either a plan amendment or a plan revision."); see 43 C.F.R. § 1610.5-5 (RMP amendments triggered by "new or revised policy").

lease.").  BLM protected the following specific areas from the significant adverse impacts caused by oil shale and tar sands leasing and development:

1.      all areas that the BLM has identified as having wilderness characteristics (LWC);

2.      the whole of Adobe Town Very Rare or Uncommon area;

3.      core or priority sage-grouse habitat in Colorado and Utah, but not Wyoming;

4.      all Areas of Critical Environmental Concern (ACECs) and area currently under consideration for designation as ACECs; and

5.      all areas identified as excluded from commercial oil shale and tar sands leasing in Alternative C of the September 2008 Oil Shale and Tar Sands Programmatic EIS.[7]

AR #1 at 10.[8]

In the RMP Amendments, BLM also adopted a formal leasing program for oil shale, which stemmed from prior practices.  In 2007, BLM issued six Research, Development and Demonstration (RD&D) leases for oil shale. AR #5 at 352.  Each lease covered 160 acres, and included a "preferential right lease area" of 4,960 additional acres should development prove to be commercially viable. AR #5 at 351.  To convert the RD&D lease to a commercial-scale lease, the lessee must employ a technology that allows for "production in commercial quantities" (43 U.S.C. § 3926(b)(1)), and BLM must complete a NEPA review. AR #1 at 106.  In 2012, BLM issued two additional RD&D leases but, in contrast to the 2007 leases, these 160-acre leases could only be converted to a commercial lease on an additional 480 acres. AR #4197, #4198.[9]  The RMP Amendments formalized this RD&D process for oil shale, adopting an "RD&D First" requirement and limiting the size of the lease to 160 acres and the preferential right lease area to 480 acres.

Lastly, the RMP Amendments prescribed certain mining techniques.  They dictate that

---

[7]      Alternative C was first described in the 2008 EIS and protects "sensitive resources within each [BLM] field office" based on existing "stipulations for no surface occupancy or seasonal limitations [that] are in place for oil and gas leasing." AR #25 at 6321-6326; AR #1 at 53.

[8]      One area that would have been unavailable under these criteria – a 2,100-acre site in the Asphalt Ridge STSA – was nonetheless designated as available because a tar sands lease application was pending when BLM completed the 2013 RMP Amendments. AR #1 at 52-53.

[9]      BLM reviewed all these leases under NEPA, and also undertook ESA consultation. AR #4198; AR #5 at 352; ER #1, #2.

strip "surface mining" may occur only where the oil shale is within 500 feet of the surface in Utah and Wyoming. AR #1 at 13, 26.  Where the depth of the shale is below 500 feet, operators must access the oil shale through an underground mine. Id.  In some RMP districts, BLM determined that "applications for commercial leases using surface mining technologies will not be accepted in the planning area." AR #1 at 108 (White River RMP area); id. at 109-111 (same restriction in Price, Kemmerer and Rawlins RMP areas and portions of Vernal RMP).

BLM completed a NEPA process for the 2013 RMP Amendments when it issued an EIS in November 2012 and a Record of Decision in March 2013. AR #1, #5-9.  In the EIS, BLM considered four alternative land use designations, and evaluated the known methods and technologies available to produce these fuels.  BLM prepared the required NEPA analysis based on available information.

> BLM also considered the wealth of information on the consequences of oil and gas and underground and surface mining activities.  The BLM used comparable data, and the BLM's professional experience with surface disturbing activities associated with these types of mineral development, to determine that the *BLM had sufficient information on the nature of the effects for an allocation decision to be made*.  The analysis of potential impacts associated with oil shale and tar sands development as disclosed in Chapters 4, 5 and 6 of the PRMP/FEIS provided essential information necessary for formulating the Approved Plan Amendments.

AR #1 at 71 (emphasis added).  Notably, BLM assessed and disclosed impacts to threatened and endangered species and their critical habitat from strip and underground mining as well as from the water diversions needed in the extraction, separation and upgrading processes. See generally, AR #6.

Although BLM performed a full NEPA analysis and completed an EIS, BLM did not undertake ESA consultation on the same RMP Amendments. ECF Doc. 38 at 3.  Instead, BLM avoided consultation by claiming the RMP Amendments "would cause no effect on any listed species or critical habitat." Id. citing AR #1 at 81.

**ARGUMENT**

I.     PETITIONERS HAVE STANDING

To establish constitutional standing, Petitioners must show: 1) an actual or imminent "injury in fact;" 2) those injuries are fairly traceable to the RMP Amendments; and 3) a favorable decision is likely to redress those injuries. Allen v. Wright, 468 U.S. 737 (1984).  Standing only needs to be shown for one plaintiff, and an organizational plaintiff must show that it or one of its members suffers injury-in-fact from the challenged agency action. Wilderness Soc'y v. Kane County, 581 F.3d 1198, 1211 (10th Cir. 2008); Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445, 447 n.3 (10th Cir. 1996).  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth v. Laidlaw Envtl. Servs., 528 U.S. 167, 183 (2000) (citations omitted).  Actual environmental harm from complained-of activity need not be shown, and "reasonable concerns" that harm is occurring is enough. Id.

Petitioners have submitted standing declarations from members of each organization that address their use of lands within each RMP at issue. New Mexico, 565 F.3d at 696 n.13 (finding intent to "use [BLM lands] in the future for specified aesthetic, recreational, and employment pursuits that would be harmed by development" sufficient to confer standing to challenge RMP amendment).  For instance, Taylor McKinnon is a member of both the Center for Biological Diversity and Grand Canyon Trust, and details specific areas where he has recreated on an ongoing basis and plans to return in the future; these areas are affected by the RMP Amendments approval of oil shale and tar sands development. McKinnon Dec. ¶¶ 1, 7-23.  He explains:

> I derive great enjoyment from viewing rare species in their natural environment, and am constantly on the lookout for both federally listed endangered and threatened species, and BLM and state listed special species as well.  I also enjoy photographing wildlife and expansive public-lands landscapes in relatively natural, unindustrialized condition. I also enjoy the clean air and water provided by these remote areas, the quietness and solitude provided by the surroundings, and the ability to share my knowledge of the area with others.

Id. at ¶ 7; see id. at ¶¶ 20-23 (photographs of areas at issue taken by Mr. McKinnon).  He further explains that "BLM's failure to consult [under the ESA] threatens my concrete interests in being able to observe endangered and threatened species in the wild, and to enjoy the lands and waters on which they depend in an undeveloped state." Id. at ¶ 15.  The other declarants detail similar uses of the lands at issue, and how oil shale and tar sands leasing and development under the RMP Amendments will harm their uses there. See Declarations of Ray Bloxham, Erik Molvar, Robin Silver and John Weisheit (filed concurrently).

BLM's RMP Amendments and noncompliance with the ESA's consultation mandate cause Petitioners' injuries.  BLM has now designated certain areas available for leasing and development, while protecting others.  Without designating areas available, oil shale and tar sands activities could not occur.[10]  And BLM's failure to comply with the ESA's consultation requirement causes Petitioners members' injury because it avoids the preventative or ameliorative actions that may otherwise result for the benefit of listed species.  Moreover, Petitioners' injuries would be redressed if the Court orders BLM to comply with its ESA consultation duties because the RMP Amendments' land use designations could either be reduced or impacts lessened through "reasonable and prudent alternatives" if consultation occurs. See S. Utah Wilderness Alliance v. OSM, 620 F.3d 1227, 1235 (10th Cir. 2010) ("in the context of procedural rights, 'the plaintiff need not establish with certainty that adherence to the procedures would necessarily change the agency's ultimate decision'") (citation omitted).

Petitioners thus satisfy the requirements for constitutional standing.

II.     STANDARD OF REVIEW

Courts review BLM's non-compliance with the ESA pursuant to the Administrative Procedure Act (APA). Davis v. Mineta, 302 F.3d 1104, 1110 (10th Cir. 2002).  Agency actions

---

[10]     Intervenor American Petroleum Institute has argued that, with the RMP Amendments, its members have "begun to invest time and resources identifying areas in which they will pursue RD&D leases" and, absent the RMP Amendments, "forward progress toward leasing will stop." ECF Doc. 7 at 4 & 7.  The trade group further acknowledged that "the authorization of this preliminary stage [in the RMP Amendments] is a critical step forward in the development of this industry." Id. at 7; id. at 4 ("the RMP Amendments have again cracked open the door for BLM to entertain leasing proposals").

are set aside when they are "arbitrary, capricious [or] an abuse of discretion or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).  Under the arbitrary and capricious standard, agencies must have "considered the relevant factors, [and] articulated a rational connection between the facts found and the choice made." Baltimore Gas & Elec. v. Natural Resources Defense Council, 462 U.S. 87, 105 (1983); Olenhouse v. Commodity Credit, 42 F.3d 1560, 1574-75 (10th Cir. 1994).  Courts assess whether the agency:

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise.

Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto., 463 U.S. 29, 43 (1983); Friends of the Bow v. Thompson, 124 F.3d 1210, 1215 (10th Cir. 1997).

III.   THE BLM VIOLATED THE ESA BY NOT CONSULTING ON THE RMP AMENDMENTS

The six RMP Amendments triggered BLM's ESA duty to consult with FWS under the ESA.  These RMP Amendments are "agency actions" within the meaning of the ESA, as they are discretionary decisions whereby BLM designated which public lands are available for oil shale and tar sands leasing and development, and imposed conditions on such uses.  BLM conceded this point in prior briefing. ECF Doc. 33 at 36, n.22.  Further, the RMP Amendments are actions that "may affect" listed species: they are the required first decision that establishes exactly where and how oil shale and tar sands deposits may be developed; and the "best scientific and commercial data available" show that water depletions that are likely to occur pursuant to the RMP Amendments will "jeopardize" the continued existence of the Four Endangered Fish, which far exceeds the ESA's low threshold for consultation.

A.   BLM RMP Amendments Are Agency Actions

The meaning of "agency action" is broadly construed under ESA section 7(a)(2). NRDC v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998).  An agency action is "any action authorized, funded, or carried out" by a federal agency. 16 U.S.C. § 1536(a)(2).  The phrase is further

defined in ESA regulations as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02. These include: "(b) the promulgation of regulations" and "(d) actions directly or indirectly causing modifications to the land, water or air." Id.

Without exception, federal land management plans meet the criteria for an ESA agency action. The Tenth Circuit has held "we have little doubt after Norton [v. Southern Utah Wilderness Alliance,] that the act of approving, amending, or revising a LRMP[11] constitutes 'action' under § 7(a)(2) of the ESA." Forest Guardians v. Forsgren, 478 F.3d 1149, 1154 (10th Cir. 2007); id. at 1159 (emphasizing "the very definition of 'action' in § 402.02 tells us that the '*promulgation* of regulations,' not the regulations themselves, constitutes 'action'") (emphasis in original); see 43 C.F.R. § 1601.0-2 (RMPs provide "a rationale, consistently applied set of regulations and procedures"); see also Alliance for Wild Rockies v. U.S. Dept. of Agric., 772 F.3d 592, 598-99 (9th Cir. 2014) ("we have recognized that environmental management plans constitute federal agency actions under the ESA").

Indeed, BLM's prior briefing in this case concedes that the RMP Amendments were an "agency action." The agency's response to Petitioners' Motion to Complete or Supplement the Administrative Record states: "BLM did not predicate its 'no effect' determination on the absence of an 'agency action' or the absence of discretion in developing the OSTS [oil shale-tar sands] plan amendments … These points are not disputed…" ECF Doc. 33 at 36, n.22.[12]

---

[11]     Land and Resource Management Plans (LRMP) are the Forest Service equivalent of BLM's RMPs. The Tenth Circuit has held that "a 'land use plan' promulgated by the BLM does not differ significantly from a LRMP promulgated by the Forest Service." Forest Guardians, 478 F.3d at 1156 n. 9. LRMPs, or "Forest Plans," are regularly found to be ESA agency actions that require consultation. See Gifford-Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1064 (9th Cir. 2004); Lane County Audubon Soc'y v. Jamison, 958 F.2d 290, 294 (9th Cir. 1992).

[12]     In this same vein, BLM prepared an EIS for the RMP Amendments, acknowledging that, under NEPA, these RMP Amendment are a "major federal action." See 42 U.S.C. § 4332(2)(C); see also New Mexico, 565 F.3d at 689. Because the RMP Amendments are "major federal actions" and NEPA's "major federal action" test is more exacting than the ESA's "agency action" test (Karuk Tribe of Cal. v. U.S. Forest Serv., 681 F.3d 1006, 1024 (9th Cir. 2012) (en banc)), it necessarily follows that the RMP Amendments are ESA "agency actions."

Indeed, there are few limits on the meaning of agency actions.  The action must be an affirmative one, as opposed to an agency decision not to do something.  See W. Watersheds Project v. Matejko, 468 F.3d 1099, 1107-08 (9th Cir. 2006).  In addition, ESA consultation applies "to all actions in which there is discretionary involvement or control." 50 C.F.R. § 402.03.  More specifically, "[s]ection 7(a)(2) consultation is required so long as a federal agency retains 'some discretion' to take action for the benefit of a protected species." NRDC v. Jewell, 749 F.3d 776, 784 (9th Cir. 2014) (en banc) ("Whether an agency must consult does not turn on the degree of discretion that the agency exercises regarding the action in question, but on whether the agency has any discretion to act in a manner beneficial to a protected species or its habitat.").

Here, in adopting the RMP Amendments, BLM took the affirmative action under FLPMA to amend the RMPs and establish an allowable use on lands it administers. See 43 C.F.R. §§ 1610.5-5; 1601.0-5(n)(2); AR #5104 at 324402 (BLM Handbook stating "[l]and use plans must identify uses, or allocations, that are allowed, restricted or prohibited on the public lands… [and] where specific uses are excluded to protect resources values."); Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 59 (2004) (confirming RMP "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps"); San Juan Citizens Alliance v. Salazar, 2009 WL 824410, *8 (D. Colo. March 30, 2009) (RMPs "govern[] the use of public lands…[by] describ[ing]… 'allowable uses' of the land").

 Moreover, BLM exercised discretion in many ways in the RMP Amendments, and thus BLM could implement significant protections for listed species.  *First,* the agency decided whether and when to amend the RMPs and which RMPs to amend. See 43 C.F.R. § 1610.5-5; AR #4 at 187 (BLM "retains the discretion to …amend those land use plans, as appropriate, to address resource management issues").  *Second*, BLM decided which lands to open to oil shale and tar sands leasing and development, and which lands to protect from development. AR #4 at 222 ("The Secretary has wide latitude to allocate the public lands to particular uses, and to employ the mechanism of land use allocation to protect for certain resource values or,

conversely, develop some resource values to the detriment of others."); id. at 223 ("the question of where such development is most appropriate and under what restrictions it may be conducted is left, under FLPMA, to" BLM); see also Lockyer v. U.S. Dep't of Agric., 575 F.3d 999, 1018-19 (9th Cir. 2009) (finding Nationwide Roadless Rule was agency action because it designated areas where logging and road-building can and cannot occur). *Third*, BLM determined how oil shale can be leased – by imposing the "RD&D First" requirement and reduced preference lease right area for oil shale, and by *not* imposing those requirements for tar sands. AR #1 at 72; AR #5 at 347; AR #1 at 48.[13] *Fourth*, BLM restricted the type of mining that may occur in certain locations, namely by banning strip mining of oil shale deposits below 500 feet. AR #5 at 327; AR #1 at 13 ("Allow only the use of surface mining technologies in areas in Utah and Wyoming where the overburden is 0 to 500 feet thick."); id. at 26.[14]

In sum, as the agency has conceded, BLM's RMP Amendments are ESA agency actions, wherein BLM affirmatively amended its land use plans, establishing a program for leasing and developing oil shale and tar sands deposits.  Through this discretionary action, BLM is able to protect and benefit endangered species and their habitat. See Karuk Tribe, 681 F.3d at 1024.

B.      The RMP Amendments May Affect Listed Species And Critical Habitat

1.      The "May Affect" Threshold Is Low

ESA consultation is required if an agency action "may affect" a species or its critical habitat. 50 C.F.R. § 402.14(a).  The "best scientific and commercial information available" must be used to determine whether there is a "may affect." 16 U.S.C. § 1536(a)(2).

---

[13]     An equivalent RD&D requirement for tar sands, though justified, was deemed not feasible due to pending deadlines on the RMP Amendments. AR #2866 at 508773 (BLM email conceding "the rationale for RD&D on oil shale holds true for tar sands as well. … In a nutshell, the rationale is the same for tar sands – there's no commercially viable technology"); AR #2910 at 509076  (explaining no time to implement RD&D requirement for tar sands: "short of a new federal register notice process, there is no tar-sands R&D leasing, so this is the closest we can come without adding an additional rulemaking (which we couldn't bring to conclusion before the ROD)").
[14]     Because there are no oil shale deposits less than 500-feet deep in Colorado, no similar restriction was required there.

This ESA consultation threshold is low.  FWS explained that under the "may affect" standard, "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers formal consultation." 51 Fed. Reg. 19,926, 19,949 (June 3, 1986).  FWS's Consultation Handbook similarly provides the 'may affect' standard is satisfied "when a proposed action may pose *any* effects on listed species or designated critical habitat." ESA Consultation Handbook at xvi (emphasis added).[15]  Judge Martinez recently ruled that "[t]his 'may affect' standard triggering the consultation requirement is low." Colo. Envtl. Coal. v. Dept. of Defense, 819 F.Supp.2d 1193, 1221-22 (D. Colo. 2011); see also Wilderness Soc'y v. Wisely, 524 F.Supp.2d 1285, 1298 (D. Colo. 2007) (determining consultation necessary when "adverse effects are possible").  The Ninth Circuit has held that "[a]ctions that have any chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA." Karuk Tribe, 681 F.3d at 1027 (reasoning "may affect" threshold "must be set sufficiently low to allow Federal agencies to satisfy their duty to insure that their actions do not jeopardize listed species or adversely modify critical habitat.").

Applying this low threshold, courts have ruled that the "may affect" standard is satisfied even if impacts to species are "highly unlikely." Colo. Envtl. Coal., 819 F.Supp.2d at 1221.  In Colo. Envtl. Coal., the Court rejected the agency's "no effect" determination because the agency's own environmental assessment disclosed several possible effects on listed species.  The difference between highly unlikely effects and no effects, the Court explained, is "not [an] unimportant distinction.**"** Id. at 1221-22; see also Swan View Coalition v Weber, –F.Supp.3d–, 2014 WL 4824551, *8 (D. Mont. Sept. 25, 2014) (ruling both mitigated impacts and "trivial impacts" meet may affect threshold).

Some courts have ruled that the mere presence of listed species or designated critical habitat within the action area satisfies the "may affect" threshold. See, e.g., W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 496 (9th Cir. 2011) (finding "[t]he sheer number of acres

---

[15] Available at: www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf.

affected by the 2006 Regulations and number of special status species who reside on those lands [governed by the challenged regulation] alone suggest that the proposed amendments 'may affect' a listed species or its critical habitat"); <u>Alliance for Wild Rockies v. Kruger</u>, 2014 WL 1614426, *1 (D. Mont. April 23, 2014) (explaining reason Forest Service consulted was because agency "determined that lynx are a species that 'may be present' within the Project area"); <u>cf.</u> 50 C.F.R. § 402.12(d)(1) ("If the Director advises that no listed species or critical habitat may be present, the Federal agency need not prepare a biological assessment and further consultation is not required.").

Here, the areas designated for oil shale and tar sands uses contain listed species and critical habitat. ECF Doc. 28, ¶ 65 (BLM Answer).  BLM's EIS Appendix E identifies the species located within the area of the RMP Amendments. AR #8 at 2160.  BLM detailed:

> Listed species and critical habitat are likely to be present in the lands described in the land use plan amendment. Tables 4.8.1-6 and 5.8.1-6 in the 2008 FPEIS for oil shale and tar sands identify the listed species that occur in the states of Colorado, Utah, and Wyoming where the land use plan amendments would allocate lands for either oil shale or tar sands leasing. Portions of the designated areas are occupied by listed species or contain designated critical habitat.

AR #488 at 136759.  This alone satisfies the "may affect" standard. <u>See</u> <u>Kraayenbrink</u>, 632 F.3d at 495-96 ("we conclude that the regulatory amendments here—which affect 160 million acres of public land, home to hundreds of special status species—handily meet that threshold").

Moreover, as discussed below, listed species are not merely present on lands allocated for oil shale and tar sands extraction, but, by BLM's own admission, are likely to suffer serious harm from those activities.

> 2.    <u>Because The RMP Amendments Are A Precondition To Leasing And Developing Lands Containing Oil Shale And Tar Sands, They May Affect Listed Species</u>

Under FLPMA, RMPs play a critical role in how public lands are used.  They dictate how BLM manages public lands. 43 U.S.C. § 1732(a).  Unless an area is designated for a particular use, that use is not permitted. 43 C.F.R. § 1601.0-2 (RMPs "control future management actions"); <u>Norton</u>, 542 U.S. at 69 ("The statutory directive that BLM manage 'in accordance

with' land use plans, and the regulatory requirement that authorizations and actions 'conform to'
those plans, prevent BLM from taking actions inconsistent with the provisions of a land use
plan.'"); Utah Shared Access Alliance v. Carpenter, 463 F.3d 1125, 1129 (10th Cir. 2006)
("FLPMA prohibits the BLM from taking actions inconsistent with the provisions of RMPs.").
Site-specific actions must be consistent with the land use decision made in an RMP. 43 C.F.R. §
1610.5–3 ("All future resource management authorizations and actions … shall conform to the
approved plan."); Pennaco Energy, 377 F.3d at 1151 ("Once an RMP has been issued, and
allowable uses specified, any future actions must conform to that plan"); AR #5104 at 324389,
324431; AR #4 at 275 (BLM acknowledging it "must manage the public lands in accordance
with land use plans").

Here, the six RMP Amendments determined whether, where and how public lands may
be leased and developed for oil shale and tar sands. See AR #4 at 187 ("This means that no
leasing or development of oil shale and tar sands resources may occur on the public lands unless
such activity is consistent with the applicable land use plan."); AR #1 at 106 ("Any new RD&D
lease would have to be consistent with the applicable BLM land use plans.").  They establish
which 810,000 acres are available for leasing and development and thus oil shale and tar sands
activities can now occur on lands containing or affecting listed species and their critical habitat.
See Pacific Rivers Council v. Shepard, 2012 WL 950032, *3 (D. Or. Mar. 20, 2012) (finding
BLM's RMP revisions "substantially increases the allowable timber harvest, decreases
protections for riparian reserves, and clearly will have some effect—whether negative or
positive—on the threatened and endangered species and their critical habitat located within the
lands governed by the [RMPs]").

BLM's exclusion of certain lands from development highlights why the RMP
Amendments' land use designations satisfy the "may affect" test.  BLM protected the following
special resource values by excluding lands in the RMP Amendments: (1) all areas that the BLM
has identified as having wilderness characteristics; (2) the whole of Adobe Town Very Rare or
Uncommon area; (3) core or priority sage-grouse habitat, except in Wyoming; (4) all Areas of

Critical Environmental Concern (ACECs) and areas currently under consideration for designation as ACECs; and (5) all areas identified as excluded from commercial oil shale and tar sands leasing in Alternative C of the 2008 EIS. AR #1 at 10; id. at 24 (reasoning "decreasing the amount of acreage available for future leasing and development significantly reduces the potential impacts from such development on water resources, fragile soils and known archeological sites in the areas not included").  As BLM explained:

> decreasing the amount of acreage available for future leasing and development significantly reduces the potential impacts from such development on water resources, fragile soils, and known archeological sites in the areas that are not included.

AR #1 at 24; AR #4 at 276 (BLM explaining areas were closed to oil shale and tar sands development "to protect wildlife resources").  Just as the lands omitted from development under the RMP Amendments are now protected from adverse impacts, those lands the RMP Amendments made available are now subject to activities that "may affect" the listed species found there.

Notably, BLM determined in its EIS that the RMP Amendments "may affect" listed species. See, e.g., AR #6 at 960-91 (adverse effects from oil shale); id. at 1180-96 (adverse effects from tar sands); see also AR #787 at 24746 (FWS revealing "potentially substantial impacts on fish and wildlife resources"); id. at 24747-48 (FWS indicating "large-scale leasing may have significant impacts to certain listed and non-listed fish and wildlife resources"); see AR #5117 at 309197 (BLM's EIS for 1984 Hydrocarbon Leasing Program describes impacts from tar sands development).  BLM further acknowledges these adverse impacts to listed species by identifying applicable mitigation measures in the EIS. AR #6 at 996, 1201; AR #8 at 2218-21 (identifying measures imposed at leasing and permitting phases, including those relating to water depletions and Four Endangered Fish).  Accordingly, because BLM's NEPA analysis of the RMP Amendments identified adverse impacts to listed species, this same agency action "may affect" listed species and required BLM to consult with FWS. See Colo. Envtl. Coal., 819 F.Supp.2d at 1221-22 (finding environmental assessment's determinations supported duty to consult).

3.     Adverse Effects To Four Endangered Fish

The RMP Amendments' specific effects on the Four Endangered Fish satisfy the "may affect" threshold, as documented by the best available science in the administrative record. Developing oil shale and tar sands deposits will require significant volumes of water and, consequently, water depletions from the Colorado River Basin. According to the U.S. Government Accountability Office (GAO), "water is needed for five distinct groups of activities that occur during the life cycle of oil shale development: (1) extraction and retorting; (2) upgrading of oil shale, (3) reclamation, (4) power generation, and (5) population growth associated with oil shale development." AR #487 at 136747-48. BLM further states:

> in addition to water that may or may not be needed to produce the oil shale, water uses could include water for mining and drilling operations, cooling of equipment, transport of ore and processed shale, dust control for roads and mines, crushers, overburden and source rock piles, cooling of spent shale exiting the retort, fire control for the site and industrial area, irrigation for revegetation and sanitary and potable uses.

AR #4 at 256; AR #6 at 892-903 (EIS's description of water needs). As summed up by BLM, *in situ* production requires 1-3 barrels of water per oil barrel, and underground mining and surface retorting require "2.6 to 4" barrels for one barrel of oil. AR #6 at 870, 871; AR #6 at 904, 905, 907.

Tellingly, in its own EIS, BLM found that the RMP Amendments "may affect" the Four Endangered Fish.

> The Upper Colorado River Endangered Fishes Recovery Implementation Program considers any water depletions from the upper Colorado River Basin, which includes the watersheds of the Green River and the White River, an adverse effect on endangered Colorado River fishes that requires consultation and mitigation. Water depletions for individual projects could be quite large and represent a significant adverse impact on these riverine fish.

AR #6 at 987. According to the EIS, "[o]il shale development in any of the oil shale basins could affect [the Four Endangered Fish] either directly, if projects are adjacent to occupied habitats, or indirectly if project activities are located within occupied watersheds." Id.; id. at 938. Similarly, "[t]ar sands development in any of the [special tar sands areas] could affect [the Four Endangered Fish]." Id. at 1182; id. at 987 ("Any activities within watersheds that affect water

quality (e.g., land disturbance or water volume changes that affect sediment load, contaminant concentrations, total dissolved solids, and temperature of streams) or quantity (e.g., stream impoundments or withdrawals that affect base flow, peak flow magnitude, and seasonal flow pattern) could have effects in occupied areas far downstream.").  BLM further explained:

> On the basis of proximity of populations and critical habitat to potential lease areas, the greatest potential for direct impacts on endangered fishes is related to development in Utah, where the Green River and White River flow through oil shale areas.  If these areas are available for leasing, there is a relatively high probability that these species would be directly or indirectly affected by oil shale development.  In Colorado, the White River is outside potential lease areas (the closest distance is about 3 mi); however, tributaries to the White River (e.g., Yellow Creek and Piceance Creek) flow through potential lease areas, and downstream indirect effects are possible.

Id. at 987-88.  These admissions as to impacts from the RMP Amendments are irreconcilable with BLM's failure to consult.

Indeed, BLM's findings in its EIS are consistent with related ESA determinations on the Four Endangered Fish.  As the Court has already recognized, BLM and FWS have repeatedly determined that "any" water depletions cause "jeopardy" to the Four Endangered Fish and "will likely contribute to the destruction or adverse modification of their critical habitat." See ECF Doc. 38 at 16, 20.  After formal consultation on BLM's Price and Vernal RMP Revisions, for example, FWS issued "jeopardy" Biological Opinions upon finding that "any [water] depletion will jeopardize [the] continued existence" of the Four Endangered Fish. ER #9 at 306; ER #10 at 437.[16]  FWS further explained that the land uses permitted in those RMPs Revisions would cause water depletions from the Colorado River Basin and, therefore, "adversely affect" the Four Endangered Fish. ER #9 at 174; ER #10 at 330.

BLM and FWS also concluded that any water depletions – "no matter how small" – resulting from project-specific RD&D projects adversely affect the Four Endangered Fish. ER #2 at 35 ("fish species would be adversely affected by water depletions associated with the projects"); ER #5 at 76 (FWS "concurs that water depletions associated with the RD&D projects

---

[16]     Like amendments, FLPMA authorizes BLM to "revise" RMPs. 43 U.S.C. § 1712(a).  The Revisions to the Price and Vernal RMPs designated various land uses, but did not include oil shale and tar sands.

may adversely affect the" Four Endangered Fish); ER #1 at 1 ("The Projects will involve depletions to the Upper Colorado River system and therefore will adversely affect" Four Endangered Fish); ER #4 at 42 ("The projects will involve water depletions to the Upper Colorado River System [from groundwater pumping] and therefore will adversely affect" Four Endangered Fish); ER #6 at 95 ("Any water depletions, no matter how small, that are hydraulically connected to the Colorado River Basin are considered to adversely affect the Four Endangered" Fish); ER #7 at 124-25 (same).  BLM's Biological Assessment prepared during consultation on one of the leases states:

> any reduction in flow is considered a depletion of water from the Colorado River Basin as defined by the USFWS. Any depletion is automatically deemed by the USFWS to 'likely ... jeopardize the continued existence of the Colorado pikeminnow, humpback chub, bonytail chub, and razorback sucker and result in destruction or adverse modification of their critical habitat' ('may affect'). Therefore, all proposed activities on BLM-managed lands that result in water depletion, trigger a formal Endangered Species Act, Section 7 consultation with the USFWS.

ER #3 at 40.  BLM in fact engaged in formal consultation on these oil shale RD&D projects due to these impacts. ER #2, 5. And BLM should have consulted with FWS on the RMP Amendments for the exact same reasons.

FWS's review of analogous energy projects located in the RMP Amendments' action area reveals the same adverse consequences.  In its 2011 Biological Opinion for the GASCo Energy Field Development Project, FWS determined that this oil and gas project "will adversely affect [the Four Endangered Fish] by reducing the amount of water in the river system upon which they depend." ER #12 at 618; id. ("[t[he effects to all four species primarily result from the effects of the water depletion upon their habitats").  FWS's 2008 Fluid Minerals Program Water Depletions Biological Opinion similarly determined that any water depletions cause jeopardy to the Four Endangered Fish. ER #11 at 516-17.  Therein, FWS found that "[o]il and gas activities typically require the use of various amounts of water" and concluded that these water uses "would adversely affect [the Four Endangered Fish] by reducing the amount of water in the river systems upon which they depend." Id. at 515, 559.  FWS explained further that water

depletions would "cause discrete, identifiable, additive, adverse impacts to critical habitat" for the Four Endangered Fish. Id. at 560.  As the Court noted, these findings apply to the RMP Amendments because BLM, in its EIS, used the impacts from oil and gas development to predict oil shale impacts, finding these energy projects are "analogous" and "comparable." See AR #5 at 349; AR #1 at 59, 71; AR #4 at 163, 188-89; AR #6 at 862; ECF Doc. 38 at 20, 21.

In sum, water depletions that are necessary to develop oil shale and tar sands under the RMP Amendments likely violate the "jeopardy" and "adverse modification" standards for the Four Endangered Fish and these ESA standards are far more stringent than the "may affect" standard.  Accordingly, the RMP Amendments easily meet the much lower "may affect" threshold.

4.     Adverse Effects To Listed Plants And Birds

The administrative record and best available science reveal that the RMP Amendments will also result in adverse impacts to listed plants.  Initially, there are a number of plants that occur on the lands made available through the RMP Amendments, including plants that are endemic to the action area. See e.g., AR #5 at 691 (stating "all known occupied habitat" of Dudley Bluffs bladderpod "is located on lands with oil shale resources"); id. at 692 (stating habitat for Dudley Bluffs twinpod "is on the surface of oil shale deposits"); id. at 689 (stating "entire habitat" of clay reed-mustard "is underlain by oil shale"); id. at 699 (stating "entire range of the shrubby reed-mustard is underlain by oil shale and conventional oil and gas deposits"); id. at 697 (stating Parachute beardtongue "grows on steep, oil shale outcrop slopes of white shale talus").  As summarized in the EIS, "[c]lay-reed mustard, Dudley Bluffs bladderpod, Dudley Bluffs twinpod, and shrubby reed-mustard are all found on shale-derived soils and are therefore more likely to occur in potential development areas." Id. at 987.  Accordingly, as explained above, the presence of these listed plants in the area of the RMP Amendments is sufficient to meet the "may affect" threshold. See Kraayenbrink, 632 F.3d at 496.

As made possible under the RMP Amendments, surface disturbance activities, such as strip mining for oil shale and tar sands, may affect listed plants species.  BLM's EIS disclosed

that listed plants "may be affected by a variety of factors related to oil shale development, including vegetation clearing, habitat fragmentation, dispersal blockage, [and] alternation of topography." AR #5 at 987; see also id. at 691-92 (stating potential threats to continued survival of Dudley Bluffs bladderpod and twinpod "include oil shale development"); id. at 697 (potential threats to Parachute beardtongue include "oil shale development").

FWS's recent "5-Year Review" for the Dudley Bluffs bladderpod and Dudley Bluffs twinpod explains the significant impacts to these two plants from the RMP Amendments and oil shale development.[17]  In the review, FWS determined that: oil shale development in the Piceance Basin is a primary and imminent threat to both species, the Piceance Basin "encompasses the entire known range of the bladderpod and all but one occurrence of the twinpod," oil shale development could cause adverse impacts due to "a variety of impacting factors," and impacts from oil shale development "could be severe." ER #13 at 648-650.  Moreover, on RD&D leases where these two plants are found, BLM's NEPA review found that issuing these leases "may affect" the Dudley Bluffs bladderplod and Dudly Bluffs twinpod. AR #603 at 140159 AR #599 at 140121.

The record further details that the Ute-ladies' tresses is a listed plant that will be adversely affected by the RMP Amendments.  According to BLM's EIS, this plant occurs in Duchesne, Garfield, Uintah, and Wayne Counties, Utah, "and could, therefore, occur within or in the vicinity of development areas located in the Uintah Basin and the Asphalt Ridge, Hill Creek Pariette, P.R. Spring, and Raven Ridge STSAs." AR #5 at 703.  The EIS further reveals "[t]his species is dependent on a high water table, and in addition to the factors affecting upland plants, could be adversely affected by any water depletions from the Green River or White River basins associated with oil shale development in Utah." AR #6 at 987.

BLM also found that the RMP Amendments "may affect" the Mexican spotted owl and southwestern willow flycatcher.  As set forth in the EIS:

---

[17]    The ESA requires FWS to conduct a status review for each listed species at least every five years. 16 U.S.C. § 1533(c)(2).

Listed bird species that could be affected by commercial oil shale development include the Mexican spotted owl and southwestern willow flycatcher (Table 4.8.1-6). The Mexican spotted owl could occur year-round in steep forested canyons in Utah and could be affected if these types of habitats are disturbed during oil shale development.

The southwestern willow flycatcher is most commonly found in riparian areas, especially along large rivers (e.g., Green River). These riparian habitats could be affected directly by surface disturbance or indirectly by activities in their watersheds that resulted in alteration of topography, changes in drainage patterns, erosion, sedimentation from runoff, and oil and contaminant spills. In addition, impacts on riparian habitats that support these species could result if the habitats were crossed by project transmission lines or roads.

AR #6 at 988; id. at 1196 ("listed bird species that could be affected by commercial tar sands development include … Mexican spotted owl and southwestern willow flycatcher"); AR 8 at 2201, 2206.

Given these EIS findings, the RMP Amendments pass the "may affect" threshold for listed plants and birds.

5.    BLM's "No Effect" Determination Violates The ESA And APA

BLM maintains, nonetheless, that the RMP Amendments will have "no effect" on listed species or designated critical habitat. AR #1 at 81 (stating "action of amending land use plans… would cause no effect on any listed species or critical habitat"). BLM suggests that details about oil shale and tar sands development are uncertain and that information about the impacts is lacking. AR #1 at 81 (consultation "would be based largely on conjecture and speculation"); AR #4 at 278 (BLM suggesting "it is not possible to adequately analyze potential impacts to species or their habitat"); AR #9 at 3025 ("Given uncertainties in technology, scale (size), and location, including factors such as the amount of land disturbance and water requirements, it is currently not possible to quantify the impacts of future oil shale and tar sands development on individual threatened [and] endangered [] species."). To further justify its "no effect" finding, BLM claims that consultation will take place later, when BLM issues leases and approves development plans. AR #1 at 23, 25, 82. BLM's assertions are legally infirm and factually unsupported.

a.    BLM's Rationalizations For Its "No Effect" Determination –
Uncertainty and Deferred Consultations – Contravene The ESA

Federal agencies are not excused from ESA consultation based on claims of uncertainty.

Congress anticipated that there would be some uncertainty about agency actions and their impact

on listed species and critical habitat.  As a result, the ESA requires federal agencies to employ

the "best scientific and commercial data available" during the ESA consultation process. 16

U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d); ESA Consultation Handbook at 1-6–1-7 ("An

overriding factor in carrying out consultations should always be the use of the best available

scientific and commercial data available."); id. at 1-7 (noting where information gaps are present,

agencies should either delay completion of consultation or "develop the biological opinion with

the available information giving the benefit of the doubt to the species").  Under this ESA

standard, an agency cannot disregard the best information and science available. Conner v.

Burford, 848 F.2d 1441, 1454 (9th Cir.1988) (agencies "cannot ignore available biological

information"); Trout Unlimited v. Lohn, 645 F.Supp.2d 929, 964 (D. Or. 2007).

Courts have rejected attempts to side-step the requirement to consult on programmatic

agency actions based on allegations of uncertainty.  In Conner v. Burford, BLM attempted to

avoid consulting on a programmatic lease sale covering 1.3 million acres, claiming, as it does for

the RMP Amendments, "there is insufficient information available to complete a comprehensive

opinion and it [will undertake] … incremental-step consultation[s]." 848 F.2d at 1455.  The court

rejected BLM's attempt "to carve out a judicial exception to ESA's clear mandate that a

comprehensive biological opinion … be completed before initiation of the agency action." Id.

The court explained that "incomplete information about post-leasing activities does not excuse

the failure to comply with the statutory requirement of a comprehensive biological opinion using

the best information available." Id. at 525.  Similarly, another court ruled that, "regardless of any

uncertainty regarding the proposed infrastructure improvement, it was incumbent on the Service

to use the best information available to prepare [a] comprehensive biological opinion[]

considering all stages of the agency action." Wild Fish Conservancy v. Salazar, 628 F.3d 513,

525 (9th Cir. 2010) (citation and internal quotations are omitted).

Further, BLM cannot delay ESA compliance based on the promise of future consultations on specific projects.  The ESA requires agencies to consult "at the earliest possible time." 50 C.F.R. § 402.14(a); Colo. Envtl. Coal., 819 F.Supp.2d at 1222.  It also requires consultation on every agency action, including overarching ones like adopting agency programs, plans and "the promulgation of regulations." 50 C.F.R. § 402.02 (defining agency actions); see also 42 U.S.C. § 15927(c) (EPAct requiring BLM to develop "leasing program for research and development of oil shale and tar sands").  Accordingly, BLM cannot avoid the required comprehensive analysis that accompanies consultations on programmatic-level agency actions based on claims that future approvals of leases or development permits may undergo a consultation process. See ER #8 at 137 (summarizing legal decisions requiring consultation on actions "that guide the development and implementation of future site-specific actions"); Conner, 848 F.2d at 1453, 1455-56 (holding ESA Section 7 requires agencies to consider "all phases of the agency action," and rejecting "incremental-step consultation"); Nat'l Wildlife Fed'n v. Brownlee, 402 F.Supp.2d 1, 10 (D.D.C. 2005) (holding agency violated ESA by failing to consult on nationwide permits, even though future consultations would occur on site-specific permits).

The ESA's requirements to consult early in the process and at the programmatic level ensure impacted species benefit from the insight provided by a comprehensive evaluation. Through large-scale consultations, the piecemeal destruction of species habitat that comes with only small-scale, project-level consultations is avoided.  For these reasons, FWS criticized BLM's approach when commenting on the EIS for the RMP Amendments:

> BLM is proposing to conduct Section 7 consultations when developing supplemental Environmental Assessments associated with future lease sales and projects.  We have concerns that a fragmented consultation process will preclude the ability to conduct a cumulative effects analysis, not only for oil shale and tar sands development, but also for other land development in the action area.
> …
> Early consultation considering a landscape-scale view can identify concerns early in the planning process and help identify strategies to assist in the recovery of listed species.

AR #787 at 24749.  FWS offered a similar explanation when reviewing an energy project's impact on a listed plant within the Vernal RMP area:

30

> There are two levels at which oil and gas development impact *Sclerocactus wetlandicus* [Uintah Basin hookless cactus]: 1) on a localized level within the immediate proximity of known cactus locations, and 2) on a broader landscape scale.
>
> …
>
> Through section 7 consultations, individual projects on a case-by-case basis…have not been likely to jeopardize the continued existence of S. *wetlandicus* because of commitments to mitigation measures. As a result, hundreds of energy development projects have been approved across the landscape of the Uinta Basin. As a result, habitat fragmentation, fugitive dust, invasive species, and hydrologic changes have increased across the landscape. In the foreseeable future these disturbances are likely to reach a level at which recovery of S. *wetlandicus* will be appreciably reduced.

ER #12 at 607-08.

The same reasoning recently persuaded the court in <u>Salix v. U.S. Forest Service</u> to find that the U.S. Forest Service violated the ESA by not consulting on a programmatic plan to conserve the Canada lynx on eleven national forests. <u>Salix v. U.S. Forest Serv.</u>, 944 F.Supp.2d 984 (D. Mont. 2013) (appeal pending, 9th Cir. No. 13-35624).  The court rejected the Forest Service's claim "that project-specific analysis is sufficient to protect the lynx and its habitat in the larger region." <u>Id</u>. at 1000.  Instead, the court ruled that "[t]he agencies cannot shift this analysis to the project level." <u>Id</u>., citing <u>Sierra Forest Legacy v. Sherman</u>, 646 F.3d 1161, 1180 (9th Cir. 2011)).  The court relied on FWS's explanation for its ruling:

> Without programmatic guidance and planning to conserve lynx, assessment of land management effects to lynx and development of appropriate conservation strategies are left to project-specific analysis without consideration for larger landscape patterns.

<u>Id</u>. (FWS requiring "big picture approach to lynx management" and "management direction at broad scales").

BLM has repeatedly recognized the need for consultation at the landscape level.  The agency undertook formal ESA consultation on its 2008 revisions to the both the Vernal and Price RMPs (<u>see</u> ER # 9 & 10), even though the scope of these programmatic plans was far broader in terms of land uses and activities than the RMP Amendments.  It also underwent a programmatic consultation on its Fluid Mineral Program. ER #11; <u>see also</u> <u>New Mexico</u>, 565 F.3d at 691-92 (challenge to ESA consultation process for RMP amendment opening desert grasslands to oil and gas development); <u>Kraayenbrink</u>, 632 F.3d at 479 (finding ESA consultation applied to BLM's

amendments to nationwide livestock grazing regulations); <u>see also</u> <u>Wisely</u>, 524 F.Supp.2d at 1300 (challenge to adequacy of BLM's ESA consultation on RMP decision "to make the South Shale Ridge area available for oil and gas exploration").

In sum, even if the extent of impacts associated with the RMP Amendments is uncertain, such uncertainty only intensifies the need for both program and project-level ESA consultations based on the best information available. <u>See</u> ER #8 at 140.

> b.   <u>BLM's Uncertainty Claim Is Contrary To Best Available Science, Is Unsupported By The Record, And Reflects The Agency's Disregard Of Relevant Information</u>

The administrative record reveals that BLM failed to use, as the ESA requires, the "best scientific and commercial data available" upon rendering its "no effect" determination.  As detailed above, available information and data show that oil shale and tar sands development – at any scale with any technology at any location – "may affect" listed species. <u>See</u> ECF Doc. 38 at 16.  Accordingly, FWS's "no effect" determination is "not in accordance with" the ESA. <u>See</u> 5 U.S.C. § 706(2).

Moreover, BLM's "no effect" determination and uncertainty claim violate the APA's "arbitrary and capricious" standard in two significant ways: (1) BLM failed to consider relevant information, and (2) claims of uncertainty are not supported by the administrative record. <u>See Motor Vehicle</u>, 463 U.S. at 43 (courts cannot sustain decisions that run "counter to the evidence in the record").

BLM's uncertainty claim is arbitrary because BLM failed to consider FWS's Programmatic Consultation Guidance document, which establishes protocols for addressing programmatic actions where the exact nature and impact of future projects may be uncertain. ER #8 at 144-48; <u>see</u> ECF Doc. 38 at 18-19 (finding BLM "should have considered this guidance in the process of making its 'no effect' determination").  The Guidance applies to federal "programs [that] may establish standards, guidelines, or design criteria to which future actions must adhere, for example, … Bureau of [L]and [M]anagement resource management plans." ER #8 at 136; <u>id</u>. at 137 (noting consultation required for "decision[s] to adopt plans (or strategies)

that guide the implementation of future individual actions, as well as each future individual action itself, must complete the requirements of section 7 consultation").  If there is uncertainty, the agency must "examin[e] the greatest level of impacts that can occur from projects that meet the program standards." Id. at 144.  And the Guidance calls for the exact opposite conclusion about how uncertainty affects program-level consultation than that reached by BLM: "uncertainty results in the need to complete two levels of consultation, program- and project-level." Id. at 140.

BLM also failed to consider the evidence found in other ESA decisions that "run counter" to claims of uncertainty.  BLM ignored the Biological Assessments and Opinions for its RD&D leases, which demonstrate that oil shale development will result in water depletions with adverse impacts to the Four Endangered Fish. See ECF Doc. 38 at 16-17; ER #1-7.  BLM failed to consider the relevant "discussion of the species- and habitat-related impacts of water depletions in two of the planning areas directly implicated by [the] 2013 RMP Amendments," set forth in the Price and Vernal RMP Biological Opinions. See ECF Doc. 38 at 19-20; ER #9, 10.  BLM also failed to consider the discussion of impacts to the Four Endangered Fish of analogous energy development, as contained within the GASCo Energy Biological Opinion and Fluid Mineral Program Water Depletion Biological Opinion. See ECF Doc. 38 at 20-21; ER #11, 12. BLM similarly ignored the harms to the Dudley Bluffs bladderpod and twinpod from oil shale and tar sands development, as described in FWS's 5-Year Review. See ECF Doc. 38 at 23-24; ER #13.  In sum, BLM's failure to consider these relevant documents renders its "no effect" finding arbitrary. See Friends of the Bow, 124 F.3d at 1215 (agency's decision must be based on consideration of relevant factors).

In addition to not considering relevant documents and data, the administrative record contradicts BLM's claim that location, scale and technologies of oil shale and tar sands development were too uncertain.  BLM knew that development could occur on the 678,700 acres made available in Colorado, Utah and Wyoming for oil shale development and 132,220 acres within Utah's Special Tar Sands Areas for tar sands development. AR #1 at 12-13.  Because

these designated lands are "the most geologically prospective lands within each of the States of Colorado, Utah and Wyoming" (42 U.S.C. § 15929(d)(1)) and are a subset of lands included in the 2008 RMP Amendments, the available lands contain the best deposits for leasing and development. See AR 5 at 325.  Development can now occur on any of these available lands. AR #5 at 394 ("new RDD leases could be issued in any areas opened to commercial oil shale leasing"); id. at 424 ("RD&D leases could be issued in any areas opened to commercial tar sands leasing").  BLM also knew the exact size of each RD&D and commercial oil shale lease – 160 acres for RD&D leases and 480 acres for commercial leases.  Further, as BLM admits, the type of impacts would be same, regardless of scale. AR #1 at 23 ("Impacts from new RD&D projects are anticipated to be qualitatively similar but smaller in scale than those of commercial projects"); id. at 28 (impacts "analytically indistinguishable" between RD&D leasing and commercial-scale leasing).  Accordingly, BLM had no basis to claim that the location of development and extent of impacts are unknown.

Moreover, the record confirms that BLM knew how oil shale and tar sands development will occur, and the resulting water-depletion consequences. See, e.g., AR #6 at 937-38 (EIS explaining impacts of water depletions and reductions).  Although the water-use rates will likely vary project to project, the range of water depletions is known and available.  The best scientific and commercial information available, as set forth in the EIS, revealed that water depletions for in situ production requires 1-3 barrels of water for oil barrel and 2.6 to 4 barrels of water are required for one barrel of oil when mining and surface retorting are employed. AR #6 at 870, 871; AR #6 at 904, 905, 907.[18]  Given this information, including the known range of water depletions, BLM's "no effect" conclusion is unsupported. See ER 11 at 515, 518 (BLM consulting on Fluid Mineral Program even while finding "oil and gas activities typically require the use of various amounts of water").

---

[18]     Under the RMP Amendments, BLM's offered a range of oil production: "surface [] mining based operations would produce at a level of 25,000 to 30,000 bbl/day [barrels of oil per day] and in situ facilities would produce at 30,000 to 50,000 bbl/day." AR #6 at 863.

In addition, information from the RD&D leases contradict BLM's uncertainty allegation. For the Utah oil shale RD&D lease, BLM found anticipated "water depletions of up to 247 acre-feet-per-year for two years may adversely affect the four endangered Colorado River fish species." AR #565 at 139701.  BLM's Biological Assessment for the 2012 RD&D leases provides that oil shale development "will involve depletions to the Upper Colorado River system and therefore will adversely affect" the Four Endangered Fish. ER #1 at 1.  FWS similarly notes that the Four Endangered Fish "would be adversely affected by water depletions associated with the projects." ER #2 at 35.  And, as this Court found upon reviewing the RD&D Biological Assessments and Biological Opinions, the agencies reached the same conclusion in each document, such that:

> regardless of the particular situs or process of proposed oil shale and tar sands development, if a proposal resulted in any depletion of water, the proposal was likely to jeopardize a listed species.

ECF Doc. 38 at 16

Moreover, in contrast to its position on ESA consultation, BLM relied on the analysis conducted for the RD&D leases to evaluate the RMP Amendments under NEPA.  The EIS explains that it was "drawing on the expected environmental effects of oil shale RD&D projects on the six first-round 160-acre RD&D leases and the two 160-acre second-round leases mentioned above as analyzed in the Environmental Assessments (EAs) prepared for those projects." AR #5 at 349; AR #4 at 188 (BLM repeating "the environmental impacts analysis draws on the expected environmental effects of oil shale RD&D projects").  Accordingly, BLM could have employed the same analytical framework as in its EIS – using information derived from the RD&D lease approvals – to consult on the RMP Amendments.

BLM's uncertainty claim is also undercut by the information available about analogous resource extraction activities.  To provide the required NEPA analysis, BLM found that the impacts of developing oil shale and tar sands deposits could be analyzed using information about oil and gas and mining activities, given that all these activities were "comparable" in how they impact listed species. AR #6 at 862, 1096.  BLM explained the comparison in its EIS:

> In cases in which information on impacting factors was not available for commercial oil shale or tar sands technologies, such factors were developed from experience in the oil and gas industry.

AR #5 at 349. BLM's Record of Decision confirmed this explanation:

> BLM also considered the wealth of information on the consequences of oil and gas and underground and surface mining activities. The BLM used comparable data, and the BLM's professional experience with surface disturbing activities associated with these types of mineral development, to determine that the BLM had sufficient information on the nature of the effects for an allocation decision to be made.

AR #1 at 71; id. at 59 (finding tar sands development would result in "impacts similar to those of mining"). In addition,

> information on the effects of oil shale and tar sands technologies was derived from other types of mineral development. The BLM has taken this approach because it anticipates, to the best of its knowledge, that the surface disturbing activities involved with these other types of mineral development are comparable to those that may result from oil shale and tar sands development.

AR #4 at 188-89. And, according to BLM:

> the 'best available data' the BLM has relied on in developing its analytical assumptions continue to be predicated on the assumed similarities of oil shale/tar sands development technologies to development of conventional energy sources such as oil and gas, and coal.

Id. at 163. BLM makes these comparisons because they provide the "best available data," which is the same standard that BLM must employ under the ESA. See 16 U.S.C. § 1536(a)(2). As in the EIS, BLM could have utilized this same information about oil and gas impacts to comply with its ESA consultation duty, rather than hiding behind claims of uncertainty. If BLM could prepare an EIS, it could complete formal consultation.

In sum, BLM failed to consider the best available information, and the evidence in the administrative record does not support, and in fact contradicts, its "no effect" determination. See Olenhouse, 42 F.3d at 1574. Accordingly, the "no effect" determination is arbitrary and capricious.

## CONCLUSION AND REQUESTED REMEDY

The Court should declare that BLM violated the ESA's consultation duty upon issuing the RMP Amendments and its "no effect" finding was arbitrary and capricious and not in

accordance with the ESA. See 5 U.S.C. § 706(2).  Consequently, the Court should order BLM to

complete formal consultation with FWS on the six RMP Amendments (16 U.S.C. § 1540(g); 5

U.S.C. § 706(1)), and prohibit BLM from approving any oil shale and tar sands lease or

development plan until formal consultation is completed.

Respectfully submitted,

April 10, 2015                                   */s/ Neil Levine*
                                                 Neil Levine
                                                 Aaron M.  Paul
                                                 Grand Canyon Trust
                                                 4454 Tennyson Street
                                                 Denver, Colorado 80212
                                                 Tel. 303-455-0604
                                                 nlevine@grandcanyontrust.org
                                                 apaul@grandcanyontrust.org

                                                 Marc Fink
                                                 Center for Biological Diversity
                                                 209 East 7th Street
                                                 Duluth, Minnesota  55805
                                                 Tel: 218-464-0539
                                                 mfink@biologicaldiversity.org

                                                 Anne Mariah M. Tapp
                                                 Grand Canyon Trust
                                                 2601 N. Fort Valley Rd
                                                 Flagstaff, AZ 86001
                                                 Tel: 928-774-7488
                                                 atapp@grandcanyontrust.org

                                                 Matt Kenna
                                                 Public Interest Environmental Law
                                                 679 E. 2nd Ave., Suite 11B
                                                 Durango, CO 81301
                                                 Tel: 970-385-6941
                                                 mattkenna@gmail.com

                                                 *Attorney for Plaintiffs Rocky Mountain Wild, Grand*
                                                 *Canyon Trust, Center for Biological Diversity,*
                                                 *Sierra Club, Southern Utah  Wilderness Alliance,*
                                                 *Biodiversity Conservation Alliance, and Living*
                                                 *Rivers*

CERTIFICATE OF SERVICE

 I hereby certify that on April 10, 2015, I electronically transmitted this OPENING BRIEF IN SUPPORT OF PETITION FOR REVIEW to the Clerk's Office using the CM/ECF System for filing, which will generate a Notice of Filing and Service on all parties' counsel who are all registered CM/ECF users.

*/s/ Neil Levine*
Neil Levine
