# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. 1:13-cv-1988-JLK

**ROCKY MOUNTAIN WILD,**
**GRAND CANYON TRUST,**
**CENTER FOR BIOLOGICAL DIVERSITY,**
**SIERRA CLUB,**
**SOUTHERN UTAH WILDERNESS ALLIANCE,**
**BIODIVERSITY CONSERVATION ALLIANCE, and**
**LIVING RIVERS,**

Petitioners,
v.

**U.S. BUREAU OF LAND MANAGEMENT, et al.,**[1]

Respondents,

**AMERICAN PETROLEUM INSTITUTE**,

Respondent -Intervenor.

---

## ORDER

---

Kane, J.

This case stands at the juncture of competing federal mandates regarding the Bureau of

Land Management's ("BLM") stewardship of federal lands.  BLM must manage federal lands in

a manner that balances their scientific, scenic, historical, and ecological value while permitting

their exploitation as domestic sources of minerals, fuel, and timber.  If BLM engages in this

---

[1] Petitioners brought this lawsuit against Respondents: 1) Neil Kornze, Director, Bureau of Land Management, and 2) U.S. Bureau of Land Management.  Neil Kornze is no longer the Director of the agency.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, his successor is automatically substituted as a party.  Currently, the agency identifies Brian Steed, Deputy Director for Policy and Programs, as exercising the authority of the Director.

balance in ways that "may affect" listed species or critical habitat, the Endangered Species Act ("ESA") requires it to consult with the U.S. Fish and Wildlife Service ("FWS") to avoid jeopardizing their continued existence.  In 2005, Congress amended the Energy Policy Act to direct BLM to establish a commercial leasing program for oil shale and tar sands ("OSTS")[2] exploration activities, and to identify the most geologically prospective OSTS resources in Colorado, Utah, and Wyoming, and make them available for future leasing.

This suit is one in a series of administrative challenges to BLM's attempts to comply with the 2005 Energy Policy Act.  The initial challenges were to BLM's 2008 Resource Management Plan ("Plan") Amendments (the "2008 Amendments").  Challengers characterized the 2008 Amendments as ill-conceived and rash.  In settling those challenges, BLM agreed to revisit the 2008 Amendments.

BLM issued a new Record of Decision approving revised Plan Amendments in March 2013 (the "2013 Amendments"), significantly altering its approach to OSTS development. Rather than open the door to immediate commercial development, the 2013 Amendments opted for a phased approach that would limit leasing, initially, to small research and development sites. The 2013 Amendments also took a different tack as to ESA compliance, with BLM separating the effects of the programmatic/planning decision from the effects of project-level decisions that might be made in the future.  Given the "nascent character" of the OSTS industry, BLM determined consulting with FWS under Section 7 of the ESA at the Plan Amendment stage

---

[2] Congress considered these unconventional fuels to be "strategically important domestic resources."  42 U.S.C. § 15927(b)(1).  Oil shale is a sedimentary rock (with deposits of organic compounds) that has not undergone enough geologic pressure, heat, and time to become conventional oil, and tar sands are a combination of sand, bitumen (a mixture of hydrocarbons), water, and clay.  Ctr. for Sustainable Sys., Univ. of Mich., "Unconventional Fossil Fuels Factsheet," Pub. No. CSS13-19 (2018), *available at* http://css.umich.edu/factsheets/unconventional-fossil-fuels-factsheet.

would be speculative and linked to events that may never occur, rather than to the actual federal action at issue.  It further concluded that the Amendments would have "no effect" on species or habitat and thus did not trigger consultation under the ESA.

Petitioners filed suit to set aside the 2013 Amendments and to compel compliance with the ESA's consultation requirement.  Petitioners contend that BLM violated the ESA by failing to conduct and complete consultation with FWS before approving six of the Amendments.  Having considered the parties' briefs and oral argument (ECF Nos. 45, 51, 52, 54, 65), the record, and the statutory and regulatory framework governing BLM's actions in this particular case, I find BLM's phased approach to ESA compliance for the 2013 Amendments to be within the scope of its authority and not unlawful.

## BACKGROUND

The Federal Land Policy Management Act ("FLPMA") directs BLM to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values," while simultaneously recognizing "the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands . . . ."  43 U.S.C. § 1701(a)(8) & (12).  Section 7(a)(2) of the ESA requires federal agencies like BLM, in consultation with FWS (and the National Marine Fisheries Service, if applicable),[3] to ensure that any actions they take in carrying out their duties are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat."  16 U.S.C. § 1536(a)(2).

---

[3] The National Marine Fisheries Service has responsibility for marine wildlife and fish such as whales and salmon, which are not implicated here.  FWS has primary responsibility for the terrestrial and freshwater organisms that inhabit the lands covered by BLM's Plan Amendments.

The regulations governing Section 7 compliance require federal agencies to review their actions at the "earliest possible time" to determine whether they "may affect" listed species or critical habitat.  50 C.F.R. § 402.14.  If the determination is made, "formal consultation" is generally required.  *Id.*  "Formal consultation" is a process between FWS and the action agency, in this case BLM, that commences with the agency's formal written request for consultation and concludes with FWS issuing a biological opinion stating its view as to whether or not an action is likely to jeopardize the continued existence of listed species or habitat.  *See id.* § 402.02.

The "may affect" determination is substantive, with agencies being charged to consider both the "direct" and "indirect" effects of a proposed action and seek FWS guidance accordingly. Agencies may engage in "informal consultation" with FWS to determine whether formal consultation is required, or prepare a "biological assessment" in cooperation with FWS to evaluate the action's potential effects on listed species and critical habitat.  *See id.* §§ 402.02, 402.12 – 13.  "Formal consultation" is excused if, as a result of informal consultation or the preparation of a biological assessment, the action agency determines that the proposed action is "not likely to adversely affect any listed species or critical habitat."  *Id.* § 402.14(b).

Within this regulatory framework, BLM took up Congress's 2005 directive to create a program for OSTS exploration and development on federal lands.  Congress intended that commercial development of these resources "be conducted in an environmentally sound manner using practices that minimize impacts," 42 U.S.C. § 15927(b)(2), and directed the Secretary of the Interior to prepare a "programmatic environmental impact statement [('PEIS')] for a commercial oil shale and tar sands leasing program on public lands, with an emphasis on the most geologically prospective lands" in Colorado, Utah, and Wyoming.  *Id.* § 15927(d)(1).  The Secretary was given 18 months to complete the PEIS.  *Id.*

To fulfill its statutory obligations, BLM began work on the PEIS and initiated the process to amend its Plans for Colorado, Utah, and Wyoming.  BLM finalized its PEIS and issued its original Record of Decision for the Plan Amendments in 2008.  These Amendments designated approximately 2 million acres of federal lands as available for oil shale leasing, and approximately 430,000 acres for tar sands leasing.  AR #25 at 38-39; 2013 OSTS ROD – 006342-43.

After environmental groups challenged the agency's action, BLM agreed to withdraw the 2008 Amendments and reconsider the OSTS program entirely.  The 2013 Amendments reduced, by more than half, the acreage available for future leasing applications.  Compared to the 2008 allocations, the 2013 Amendments excluded approximately 1.3 million acres from oil shale leasing and 301,119 acres from tar sands development.  Within these excluded lands were those containing core sage grouse habitat and those with wilderness or other important wildlife characteristics.  AR #1 at 4; 2013 OSTS ROD – 00012.  Under the new plan, 678,700 acres would be made available for potential oil shale development and 132,220 acres would be made available for potential tar sands leasing.  AR #1 at 4-5; 2013 OSTS ROD – 00012-13.

The 2013 Amendments represented a new approach to commercial OSTS development.  Recognizing the "nascent character" of the OSTS industry and current lack of any "proven commercially viable technology" for OSTS fuel extraction, BLM opted for a "phased approach" to commercial development, one that would proceed from land allocation, to research and development leasing, and only then to commercial operations.  AR #1 at 4, 70, 73; 2013 OSTS ROD – 000012, 000078, 000081.  The 2013 Amendments completed the first phase—land allocation.  For the second phase, applications would be limited initially to small "Research, Development, and Demonstration" ("RD&D") leases focused on identifying and testing

5

extraction technologies.  Then, issuance of commercial leases would only be considered once a

lessee had satisfied the conditions of its RD&D lease and met the regulatory criteria for

converting an RD&D lease to a commercial one.  AR #1 at 4; 2013 OSTS ROD – 00012.

Given this phased approach and the small-scale and contingent nature of any actual

OSTS leasing activity, the 2013 Amendments cleaved the OSTS planning decision from the

ground level decisions that may or may not ever be made, and BLM tailored its National

Environmental Policy Act (NEPA) and ESA compliance activities accordingly.  Consequently,

its PEIS/NEPA analysis was limited to the "potential effects associated with possible future

leasing and development," and deferred Section 7 compliance until leasing activity was actually

proposed or "substantially likely to occur."  AR #1 at 73-75; 2013 OSTS ROD – 000081-83.  In

explaining its reasoning, BLM wrote:

> [T]his land use plan amendment is solely an allocation decision; it does not
> establish a precedent or create any legal right that would allow ground-disturbing
> activities without further agency decisionmaking and compliance with applicable statutes,
> including the ESA, NEPA, and other applicable authorities. Further, apart from possible
> socioeconomic impacts associated with speculative investments in lands adjacent to lands
> allocated for oil shale and tar sands development, there are no environmental
> consequences at all from the administrative action of amending land use plans in the
> manner described.

AR #1 at 74; 2013 OSTS ROD – 00082.  BLM continued that it "fully expects" that if in

response to a call for nominations, an application for a lease or permit or other authorization is

received, "procedures to comply with Section 7 of the ESA would be initiated at that time."  *Id.*

Viewing the allocation and execution phases separately, BLM concluded that the

Amendments would have "no effect" on species or habitat and thus did not trigger Section 7's

consultation requirement.

## STANDARD OF REVIEW

Agency decisions as to whether the ESA's Section 7 consultation requirement is met are

evaluated under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* *See*

*Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998).  Under the APA's

standard of review, petitioners must show that the agency's action was "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706 (2)(A).  An

agency's decision will be arbitrary and capricious "if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983); *see also Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006).  "In

reviewing conflicting interpretations of an agency's statutes and regulations," I must give

"'substantial deference' to the agency's interpretation of its own regulations."  *Utah Envtl. Cong.*

*v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006) (citing *Olenhouse v. Commodity Credit Corp.*,

42 F.3d 1560, 1576 (10th Cir.1994)).

## DISCUSSION

### I. Justiciability

Before I address the merits of Petitioners' claim under the APA standard, I must dispose

of Respondents' contention that this appeal is not justiciable because Petitioners lack standing

and because the case is not ripe for review.  In setting this matter for oral argument, I instructed

the parties to focus on the merits of the Section 7 argument because I was disinclined to adopt

the government's position that Petitioners lack standing.  I now affirmatively find that Petitioners

have standing to challenge BLM's alleged noncompliance with the ESA.  While I find

Respondents' ripeness arguments almost compelling, they are inextricably entwined with the

arguments on the merits.  Therefore, I deem it inappropriate to reject the Petition on ripeness

grounds.

**A. Standing**

Article III standing requires three elements:

(1) the [petitioner] must have suffered an injury in fact—an invasion of a legally
protected interest which is (a) concrete and particularized, and (b) actual or imminent, not
conjectural or hypothetical; (2) there must be a causal connection between the injury and
the conduct complained of—the injury has to be fairly traceable to the challenged action
of the [respondent], and not the result of the independent action of some third party not
before the court; and (3) it must be likely, as opposed to merely speculative, that the
injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  Respondents argue that the injury-

in-fact element is absent here.

Petitioners allege that BLM's failure to follow ESA procedures before approving the

2013 Amendments creates an increased risk of injury to Petitioners' concrete interest in species

and habitat protection.  Reply at 3, ECF No. 54.  Respondents contend that because oil shale and

tar sands development has not yet occurred, Petitioners' claims of future harms are "conjectural

injuries stemming from hypothetical [ ] activities" and do not establish concrete injury-in-fact.

Resp. at 15, ECF No. 51.  Relying on *Lujan* and *Summers v. Earth Island Institute*, 555 U.S. 488

(2009), Respondents argue that Petitioners cannot establish standing through a procedural injury.

While *Summers* made clear that "deprivation of a procedural right without some concrete

interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create

Article III standing," 555 U.S. at 496, that is not the case here.  Here, Petitioners charge a failure

to consult as required under the ESA—"a procedural requirement the disregard of which could

impair a separate concrete interest of theirs."  *Lujan*, 504 U.S. at 572.  And "where plaintiffs

properly allege a procedural violation affecting a concrete interest[,] [ ] the injury results not

from the agency's decision, but from the agency's *uninformed* decisionmaking." *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1234 (10th Cir. 2010) (internal quotations omitted). Thus, Petitioners "need only show that, in making its decision without following the . . . ESA procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm." *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002).

Respondents argue Section 7 consultation was not required because the 2013 Amendments simply made a preliminary land use allocation and do not themselves affect listed species or critical habitat; but that goes to the merits of the claim. For purposes of standing, Petitioners have alleged facts sufficient to show that the Amendments are a necessary step to leasing and permit development in areas inhabited by species designated as endangered or threatened. Further, BLM has already issued RD&D leases for oil shale projects and, according to Petitioners, approved development plans for two of the RD&D leases. *See* Reply at 4. While the parties may debate the significance of these activities to BLM's duty to consult, they are sufficient to establish that the 2013 Amendments created an increased risk of environmental harm that affects Petitioners' "concrete interest" in species and habitat protection. *See Sierra Club*, 287 F.3d at 1265 (finding an increased risk of environmental harm where the Sierra Club alleged facts sufficient to show that an easement granted by the Department of Energy was a necessary step in the construction of a road that would advance the expansion of a mining project).

Moreover, the alleged injury—the potential impact of Amendments issued without ESA consultation—is redressable by an order mandating formal ESA consultation to ensure BLM is fully informed of the consequences of its actions. *See, e.g., S. Utah Wilderness Alliance*, 620

F.3d at 1235 ("[T]he fact that [the agency] refused to issue an updated recommendation also satisfies the causation and redressability prongs—[the agency]'s recalcitrance caused an allegedly uninformed decision, and this could be redressed by a favorable court decision, even if the Secretary's ultimate decision was the same.").  Whether such a court order is warranted is, again, a matter to be decided on the merits, but the potential for redress is present.

Therefore, I find that Petitioners have standing to challenge the 2013 Amendments on the ground that BLM should have engaged in Section 7 consultation pursuant to the ESA.

**B. Ripeness**

The question of whether this case is ripe for judicial resolution is a closer call.  Courts determine whether an agency's decision is ripe for review by considering: 1) whether delayed review would cause hardship to the plaintiffs; 2) whether judicial intervention would inappropriately interfere with further administrative action; and 3) whether the courts would benefit from further factual development of the issues presented.  *Sierra Club*, 287 F.3d at 1262-63 (citing *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998)).

Respondents' arguments on ripeness are closely related to their arguments on the merits.  As such, I am receptive to the position that this Court would benefit from further factual development of the impacts of the 2013 Amendments.  As Petitioners note, however, Respondents' ripeness arguments ignore the difference between substantive and procedural claims.  *See* Reply at 6.  Unlike a substantive claim challenging the result of an ESA consultation, a procedural challenge to an agency's alleged failure to comply with required ESA procedures is ripe "at the time the [procedural] failure takes place, for the claim can never get riper."  *Ohio Forestry*, 523 U.S. at 737; *see also Sierra Club*, 287 F.3d at 1264 (extending the

rationale used in *Ohio Forestry*, which concerned NEPA procedures, to challenges alleging noncompliance with ESA procedures).[4]

Furthermore, Respondents have failed to completely refute Petitioners' claim that delayed review will cause them hardship.  Although BLM assures that it will conduct more ESA analysis before authorizing any OSTS leasing or development (AR #1 at 2, 74-75; 2013 OSTS ROD – 000010, 000082-83; Resp. at 20), the Petitioners allege potential harm resulting from the failure to consult at the programmatic, or "landscape," level before the Amendments were issued.[5]  This failure, Petitioners argue, cannot be cured by project-level consultations.  Reply at 7.  As BLM has no immediate plans to engage in a programmatic consultation for its OSTS activities, judicial intervention, if necessary, would not inappropriately interfere with further administrative action.  In sum, Respondents' ripeness arguments apply with greater force to the merits of the case and do not convince me that the Tenth Circuit's previous application of *Ohio Forestry* to an ESA failure-to-consult claim does not control here.  As a result, I find that BLM's alleged failure to conduct a required Section 7 consultation before issuing the 2013 Amendments is ripe for review notwithstanding the fact that no commercial leases have been approved.

## II. Merits of the Section 7 Argument

Turning now to the merits of this challenge, Petitioners' essential argument on appeal is that BLM's "no effect" determination violates the ESA's consultation requirement and is thus

---

[4] Respondents rely in part on a D.C. Circuit case wherein the court concluded that petitioners' ESA claim was not yet ripe because the agency was just in the initial stage of a multi-stage leasing program.  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 483 (D.C. Cir. 2009).  I find this reasoning to be more compelling at the merits stage and will not apply it to summarily dismiss an ESA claim on the basis of ripeness, especially when the Tenth Circuit has made clear that for purposes of justiciability, a claim alleging noncompliance with ESA procedures becomes ripe at the time the failure takes place.  *Sierra Club*, 287 F.3d at 1263-64.

[5] Whether and when such a consultation is required is, again, a matter to be discussed and resolved on the merits, which I do below.

unlawful under the APA's standard of review.  Pursuant to the ESA and its implementing

regulations, formal consultation is required for any "agency action" that "may affect" listed

species or critical habitat, unless the agency and the Service determine through informal

consultation that the action "is not likely to adversely affect any listed species or critical habitat."

16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a), (b)(1).  BLM concedes that the 2013

Amendments constitute an "agency action," but disputes that the action meets the "may affect"

threshold triggering consultation under the ESA.  *See* Oral Arg. Tr. at 23:18-21; Resp. at 22-36.

Rejecting BLM's attempt to justify its "no effect" determination by deferring Section 7

compliance until later, Petitioners argue that Section 7(a)(2) requires consultation now "to avoid

the piecemeal destruction of species and their habitats by individual projects."  Reply at 2.

As advocated by the Petitioners, the "may affect standard triggering the consultation

requirement is low."  *See, e.g., Colo. Envtl. Coal. v. Dep't of Def.*, 819 F. Supp. 2d 1193, 1221-

22 (D. Colo. 2011).  However, when an agency determines that there will be "no effect" upon

endangered species, there is no duty to formally consult under Section 7.  *See* 50 C.F.R. §

402.14(b); *see also  Colo. Envtl. Coal.,* 819 F. Supp. 2d at 1221.  The "effect" of a proposed

action includes both direct and indirect effects on the species or critical habitat, together with the

effects of interrelated or interdependent activities.  50 C.F.R. § 402.02 (defining "effects of the

action"); *see also San Luis & Delta–Mendota Water Auth. v. Locke*, 776 F.3d 971, 1008-09 (9th

Cir. 2014).

Before turning my analysis to the regulatory definition of "effects of the action," I first

consider BLM's "no effect" determination in the broader context of the applicable statutory

framework and Tenth Circuit precedent.

**A. BLM's "No Effect" Determination**

1. *BLM's decision is a reasonable effort to fulfill overlapping statutory obligations.*

The necessity that BLM proceed under the 2005 Energy Policy Act to establish a commercial leasing program provides an unprecedented statutory context for analyzing when the ESA Section 7 consultation requirement should be triggered.  Petitioners urge me to treat the 2013 Amendments similarly to traditional oil and gas leasing on BLM lands.  Opening Br. at 31, ECF No. 45; Reply at 16.  Meanwhile, BLM analogizes the step approach it has set out for OSTS to offshore leasing because BLM maintains total discretion over the decision of whether to issue a lease after allocating lands.  Oral Arg. Tr. at 18; Resp. at 9, n.4.

I find BLM's argument to be more persuasive.  From its first set of amendments in 2008, BLM has distinguished its Plan Amendments for OSTS as actions of limited scope, distinct from its oil and gas leasing practices.  It has done so by committing to conducting a NEPA analysis before the issuance of any lease for OSTS resources.  *See* AR #25 at 38; 2013 OSTS ROD – 006342.  Indeed, BLM's actions in the 2013 Amendments are consistent with this commitment, as BLM conducted a second PEIS and required that applicants first successfully apply for an RD&D lease before they may be eligible for a commercial lease.  *See* AR #1 at 2, 4, 76-77; 2013 OSTS ROD – 000010, 000012, 000084-85.  Further, BLM has committed, on record before this Court as well as in the Record of Decision itself,  to conducting Section 7 consultation at the time it receives an application for a lease or an application to convert an existing RD&D lease to a commercial lease.  Oral Arg. Tr. at 21–23; AR #1 at 2; 2013 OSTS ROD – 000010.

This segmented process for environmental review more closely resembles the stage-by-stage process for offshore leasing under the Outer Continental Shelf Lands Act ("OCSLA"), as opposed to the certainty of leasing for potential development in traditional oil and gas production.  For OCSLA leasing programs, courts have held that Section 7 consultation is not

required at the preliminary stage of a leasing program. *See Ctr. for Biological Diversity v. U.S.*

*Dep't of Interior*, 563 F.3d at 483 ("Given the multi-stage nature of leasing programs under

OCSLA, [courts] must consider any environmental effects of a leasing program on a stage-by-

stage basis, and correspondingly evaluate ESA's obligations with respect to each particular stage

of the program."); *North Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C. Cir. 1980)

(concluding the agency's segmented approach under OCSLA satisfied the ESA because the

agency performed "a comprehensive analysis of all the ramifications of the lease sale" and

honored "the substantive prescription of section 7(a)(2) to preserve endangered life" after

obtaining new information); *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147,

174–78 (D.D.C. 2014) ("All courts considering lease sales under the OCSLA have concluded

that lease sales do not constitute an irreversible or irretrievable commitment of resources within

the meaning of section 7(d).") (internal quotations omitted).  Similar to the position of lease

holders for offshore drilling under OSCLA, applicants for RD&D leases for OSTS will be on

notice that obtaining approval is contingent upon environmental review under both NEPA and

Section 7 of the ESA.

BLM repeatedly proffers that its allocation of certain lands as available for application

for lease is an action of limited scope because the 2013 Amendments do not authorize the

issuance of any specific leases or ground disturbing activity.  AR #1 at 5-6; 2013 OSTS ROD –

000013-14; Resp. at 9.  BLM's characterization of the 2013 Amendments as an action of limited

scope makes sense in the context of the legislative history of Section 7 of the ESA.  As implied

by Senator Culver's example of the need to identify "a conflict (between a species and the

*project*)" early to facilitate "easier . . . *design [of] an alternative* consistent with the requirements

of the act, or to abandon the proposed action," there must be something relatively concrete

proposed to create an effective analysis of when, where, why, and how a proposed action will affect an endangered species.  124 CONG. REC. S10,896 (daily ed. July 17, 1978) (remarks of Sen. Culver) (emphasis added); *see also North Slope Borough v. Andrus*, 486 F. Supp. 332, 355 (D.D.C. 1980) (discussing Senator Culver's remarks).  Here, nothing in the record indicates that Section 7 consultation *before* the Amendments were issued would have facilitated the kind of effective analysis envisioned by Congress.  Rather, it demonstrates that in this unique situation, early consultation would not have supported the identification of viable alternative designs or more effective protection of endangered species and critical habitat.  As BLM emphasizes, the technology to develop OSTS is not yet commercially viable and thus there is insufficient data to support such detailed analysis.  Resp. at 32-33.  Furthermore, the Energy Policy Act's mandate to make allocations of federal lands as available for application for OSTS leasing constrains BLM's ability to select alternatives or abandon the action altogether.  In light of the legislative history of Section 7 and the statutory mandate of the Energy Policy Act, BLM's decision to limit the scope of the Amendments and to approach OSTS leasing on a stage-by-stage basis is not unreasonable.

2. *BLM's decision is consistent with Tenth Circuit precedent.*

The Tenth Circuit's most recent precedent on the duty to consult under the ESA is *Forest Guardians v. Forsgren*, 478 F. 3d 1149 (10th Cir. 2007).  In *Forest Guardians*, the primary point of contention was whether the Forest Service's promulgation of Land Resource Management Plans constituted continuing "agency action" that required consultation.  *Id.* at 1152-53.  The court held that the challenged activity was not an "action" under the ESA, and thus the Forest Service had no duty to consult.  *Id.* at 1160.  Although *Forest Guardians* is not dispositive of the

present case, in which BLM admits the element of "agency action," it is relevant to the analysis of BLM's "no effect" determination.

In *Forest Guardians*, the Tenth Circuit drew a familiar distinction between programmatic and project level activities, emphasizing that the challenged activity—approval of the plans—did not commit the agency to any course of action or expenditure of resources. *Id.* at 1156. This allowed the court to distinguish between what a plan *might* allow and "actual actions as a result of past or present implementation of the [p]lans." *Id.* (internal quotations omitted). While the court acknowledged that the plans allowed many activities that may have an effect on endangered species, it noted that further action would be needed for any of these activities to move forward, and that would be the proper time for review. *Id.* at 1158.

A similar programmatic and project level distinction arises in the case of the 2013 Amendments. While the 2013 Amendments do allocate lands for potential OSTS leasing, further steps, including additional NEPA analysis and other environmental reviews, are required before BLM can make a leasing decision. *See* AR #1 at 4; 2013 OSTS ROD – 000012; Resp. at 9; Oral Arg. Tr. at 20-22. And lessees would have to satisfy even more requirements before BLM could consider granting operational permit approval. *Id.* Petitioners acknowledged in their Reply that BLM has honored its commitment to engage in Section 7 consultation for all lease applications it has received. Reply at 12. As far as I am aware this is still the case. Because BLM retains the discretion to reject any application for an RD&D lease or the conversion of an RD&D lease to a commercial lease, the Plan Amendments themselves do not commit the agency to any course of action that may affect endangered species.

Of course, the fact that BLM retains discretion over later leasing decisions is, without more, inadequate to justify its "no effect" determination. I do not suggest that agencies may

simply segment large actions with potentially systemic effects into a series of smaller actions in

order to evade a problematic ESA consultation process or an unfavorable Biological Opinion.

But the facts here do not indicate that BLM is attempting to circumvent the ESA's requirements

by way of such segmentation.  Indeed, BLM's decision was largely predicated upon the fact that

there simply isn't adequate certainty about the viability of the technologies to be employed for a

programmatic consultation to be a useful exercise.

 In this case, mandating Section 7 consultation too early would likely lead to hypothetical

speculation and waste agency resources.  *See* Peter Van Tuyn & Christine Everett, *The*

*Endangered Species Act and Federal Programmatic Land and Resource Management;*

*Consultation Fact or Fiction*, 13 PUB. LAND L. REV. 99, 112 (1992) (emphasizing the importance

of  "avoid[ing] the constant speculation, accompanying unreliability of results and waste of

resources inherent in an approach which requires the federal agency to consult on all potential,

and to a large extent hypothetical, activities taken consistent with a programmatic management

scheme").  As the Tenth Circuit cautioned in another ESA case, enlarging the agency action to

lower the trigger for consultation may "hamstring government regulation in general and would

likely impede rather than advance environmental protection."  *WildEarth Guardians v. EPA*, 759

F.3d 1196, 1209 (10th Cir. 2014).

 Therefore, BLM's decision to delay Section 7 consultation pending further research and

leasing activity is consistent with the Tenth Circuit's reasoning in *Forest Guardians* and other

ESA failure-to-consult cases.

## B. Regulatory Definition of "Effects of the Action"

 The regulatory definition of "effects of the action" instructs whether BLM's

determination that the 2013 Amendments would have "no effect" on endangered species was

unlawful.  This regulatory definition requires agencies to consider direct and indirect effects of the action, as well as effects of interrelated and interdependent actions.  50 C.F.R. § 402.02.

In their Reply, Petitioners argue that the "may affect" determination to trigger the Section 7 consultation requirement is not governed by the ESA's regulatory definition for "effects of the action," and that this definition only applies after the agency has begun consultation.  Reply at 9-10.  I am not persuaded.  Although there is relatively little case law concerning a "no effect" determination, the construction that the "effects of the action" definition applies to the "no effect" determination is supported by the canon of statutory construction favoring interpreting a term consistently throughout the Act, and is the position advocated within ESA regulations and more directly by the ESA Section 7 Consultation Handbook.  *See* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv*., Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities under Section 7 of the Endangered Species Act* (1998) [hereinafter *ESA Handbook*] at B-57 (stating that the "[n]o effect on candidate species" conclusion "is reached if the proposed action and its interrelated and interdependent actions will not directly or indirectly affect candidate species").

Thus, for BLM's "no effect" determination to be improper, future or ongoing leasing and development must be a direct or indirect effect of the action, or an effect of an interdependent or interrelated action.

1. *Direct Effects*

Direct effects are those that are immediate or occur concurrently because of the agency action.  *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1009 (9th Cir. 2014); *see also ESA Handbook* at 4-26.  Because the land allocation in the 2013 Amendments is just a preliminary planning decision that does not itself authorize or approve any other activities,

leasing is not a direct effect of the action.  Future leases and resulting exploration activities that could harm endangered species would only occur after BLM approves and issues a lease at some point in the future.  Ongoing leases on the lands allocated by the 2013 Amendments are not the direct effect of the 2013 Amendments, but resulted from prior agency action.  Consequently, future and ongoing leases are not a direct effect of the 2013 Amendments.

2. *Indirect Effects*

Indirect effects are those that "are caused by the proposed action and are later in time, but still are *reasonably certain to occur*."  50 C.F.R. § 402.02 (emphasis added).  The ESA Handbook offers additional guidance to agencies to determine when later federal actions should be considered an indirect effect of their current action, and thus may trigger the consultation obligation even if the later action would itself require consultation.  *ESA Handbook* at 4-29.  In particular, to establish that a later federal action is an indirect effect of an agency action, one of three factors must be met: 1) they are reasonably certain to occur evidenced by appropriations, work plans, permits issued, or budgeting; 2) they follow a pattern of activity undertaken by an agency in an area, or 3) they are a logical extension of the proposed action.  *Id.*

The review and grant of an application for an RD&D lease or commercial lease would be a later federal action.  However, it is not clear that the other factors are met.  First, there is limited evidence that leasing is reasonably certain to occur as a result of the action.  During oral argument, the government emphasized that the grant of future RD&D leases for both oil shale and tar sands would be speculative, and therefore future leases are not reasonably certain to occur.  Oral Arg. Tr. at 32.  Specifically, the grant of a lease would be predicated upon companies developing and demonstrating technologies different from those currently in existence.  *Id.* at 33.  In its brief, the government further evinces that leasing is not reasonably

certain to occur by pointing to the fact that no company has demonstrated a viable technology to process and recover liquid tar sands in Utah.  Resp. at 25.

Second, the record does not reveal a pattern of allocation and leasing undertaken by the BLM in this area.  As discussed above, the process of issuing leases for OSTS is fundamentally distinct from that in traditional oil and gas leasing.  With the technology in its nascent stage, there simply is not enough OSTS leasing activity shown in the record to discern a pattern of activity undertaken by the agency in the area.  Resp. at 4-5 (explaining that a total of eight RD&D leases have been issued with one pending commercial lease application).

Third, issuing additional leases is not a logical extension of the 2013 Amendments, which reduced the quantity of lands available for lease and requires potential lessees to first receive and operate under RD&D leases before they may apply to convert them to commercial leases.  If anything, these actions would limit the prospects for further leasing, rather than making them a logical extension of the 2013 Amendments.

### 3. *Effects of Interrelated and Independent Actions*

Petitioners assert that ongoing leases predating the 2013 Amendments, like the one at Asphalt Ridge, are interrelated and interdependent actions, but provide no explanation for this assertion.  Reply at 11.  Under the effects of the action definition, "interrelated actions are those that are part of a larger action for their justification."  50 C.F.R. § 402.02.  Meanwhile, "interdependent actions are those that have no independent utility apart from the action under consideration."  *Id*.

The ESA Handbook directs agencies to apply a "but for" test to determine whether actions are interdependent or interrelated.  *See ESA Handbook* at 4–27; *see also Ctr. for Biological Diversity v. BLM*, 698 F. 3d 1101, 1113 (9th Cir. 2012) (adopting the ESA Handbook

definition).  By virtue of having been granted before the 2013 Amendments, the ongoing leases

simply cannot be dependent upon the 2013 Amendments as their cause.  Nor do ongoing leases

lack independent utility apart from the 2013 Amendments because they would continue

regardless of whether the 2013 Amendments were approved.  *See* AR #1 at 6; 2013 OSTS ROD

– 000014.  Therefore, BLM did not need to consider the ongoing leases in its determination that

the 2013 Amendments would have no effect on endangered species.

## C. Best Available Science Consideration

Petitioners raise the additional argument that BLM is under an obligation to use the best

available science in making the "no effect" determination.  *See* 50 C.F.R. § 402.14 (d).  Because

BLM was able to predict reasonably foreseeable impacts under a NEPA analysis, Petitioners

contend it was obligated to use the same science to make a determination that the 2013

Amendments may affect endangered species.  *See* Opening Br. at 32.  This argument is

unavailing because it relies on the assumption that leasing and development are "effects of the

action."  As I concluded above, the particular leasing and development activities relevant here do

not fall within this definition because the 2013 Amendments did not make them reasonably

certain to occur.  The cases Petitioners cite in support of this argument are distinguishable.  Here,

BLM's 2013 Amendments only identify lands where it may invite applications for OSTS leases

in the future.  It does not authorize leases or any post-leasing activities.  The best available

science requirement cannot be used to circumvent the effects of the action determination.

## D. Significance of RD&D Leases

I agree with Petitioners that in its Record of Decision and briefing in this case, BLM

focused on the likelihood of commercial leasing and development rather than on the *actuality* of

RD&D leasing and development.  Unlike the still very speculative and potentially nonexistent

commercial leases, BLM had and continued to issue RD&D leases. Any improper failure to conduct programmatic-level consultation based on the effect of RD&D leasing, however, was harmless because BLM has undertaken Section 7 consultation on every RD&D lease it has issued. That BLM and FWS were able to complete formal consultations for the eight RD&D leases does not translate to an ability to complete a *constructive* consultation for the entire OSTS program at this time. Until the results of these experimental activities become clear, consultation on a programmatic level would not be of any more value than the consultations BLM has already conducted for the RD&D leases.

BLM indicated that it would need to conduct a meaningful evaluation of the results of the RD&D leases "to obtain more information about possible development technologies and their environmental consequences before committing to broad-scale development." AR #1 at 7, 27; 2013 OSTS ROD – 000015, 000035. Requiring BLM to consult with FWS again, before the results of the RD&D activities are known, would not serve any meaningful purpose.

## E.  Section 7 Compliance Going Forward

Petitioners raise the legitimate concern that waiting to consult until the leasing stage for individual projects will compromise the ability to comprehensively assess the effects of the OSTS program. However, Petitioners ignore the alternative suggested by FWS—that BLM conduct a "landscape level evaluation once viable technologies and program details are identified." AR# 787 at 3; 2013 OSTS ROD – 024749. This alternative would not draw upon federal resources for the development of a biological assessment or opinion until there is greater certainty about if, when, and where future leasing is to occur, while still allowing for a comprehensive review of the effects on endangered species and critical habitat.

It may be difficult to say *when* such identification and specification of program details has occurred.  BLM does not explicitly state that identifying specific technologies and program details is an intermediate step in its process.  *See* Resp. at 9 (explaining three stages as (1) the amendment of Plans, (2) the determination of whether to issue a lease, and (3) the approval of a development plan).  During oral argument, however, BLM emphasized that consultation may occur at interim times, noting that it has undertaken programmatic reviews regarding water depletion that span multiple categories of agency actions.  Oral Arg. Tr. at 39-40.

If BLM fails to live up to its obligation to consult once enough information is available to indicate that commercial leasing and development, or significant expansion of current RD&D leasing, is reasonably certain to occur, Petitioners are free to file suit to force BLM to engage in the kind of landscape level analysis and consultation envisioned by FWS.

## CONCLUSION

In sum, I find Petitioners' position overly rigid in that it makes the duty to consult under Section 7 virtually limitless and ignores the flexibility built into the regulatory framework.  BLM evaluated the direct and indirect effects of the revised land allocations in the 2013 Amendments, and "concluded that future OSTS leasing or development was not reasonably certain to occur." Resp. at 1.  Section 7 compliance could wait, then, until actual project-level activities were being considered or likely to occur.  BLM's approach is consistent with the Tenth Circuit's reasoning in other ESA failure-to-consult cases and withstands scrutiny under the APA's standard of review.  I do not suggest that all Plans or Plan Amendments allocating land for future leasing determinations have "no effect" on endangered species.  My findings are limited to the unique situation here, where it is unknown whether future OSTS leasing and development will ever be viable, let alone approved and permitted.

Accordingly, for the reasons stated above, the Petition is DENIED.


DATED this 10th day of September, 2018.


_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE